ISABELLA H. JACKSON, Appellant, *vs.* THE SECURITY MU-
TUAL LIFE INSURANCE COMPANY, Appellee.

*Opinion filed February 20, 1908—Rehearing denied April 8, 1908.*

1. ACCORD AND SATISFACTION—*a disputed claim may be the sub-
ject of compromise.* If there is a *bona fide* dispute as to the amount
due upon a claim, the dispute may be the subject of a compromise
and payment be made of a certain amount in satisfaction of the
entire claim.

2. RELEASE—*when a release cannot be impeached except in a
court of equity.* Where a release under seal is pleaded in an action
at law upon a life insurance policy, the plaintiff is not entitled to
impeach the release for fraudulent representations as to collateral
matters not going to the execution of the release, nor to prove that
there was, in fact, no *bona fide* compromise. (*Farmers and Me-
chanics Life Ass.* v. *Caine,* 224 Ill. 599, explained.)

3. SEAL—*word "seal" is sufficient without a scrawl.* An instru-
ment in which the word "seal" appears following the signature of
the maker is a sealed instrument whether a scrawl is made around
the word "seal" or not; nor is it essential that there be a recital of
the seal in the body of the instrument.

APPEAL from the Branch Appellate Court for the First
District;—heard in that court on appeal from the Circuit
Court of Cook county; the Hon. M. W. PINCKNEY, Judge,
presiding.

This is an appeal from a judgment of the Appellate
Court affirming the judgment of the circuit court of Cook
county in an action in assumpsit brought by appellant to re-
cover from appellee a balance of $7500 alleged to be due
upon an insurance policy for $10,000, issued November 17,
1897, upon the life of her husband, William S. Jackson.
Appellant also seeks to recover $409.68 which she claims
was paid by her to appellee's agent during the lifetime of
her husband, upon the understanding that it was due for
unpaid premiums on said policy, but which premiums she
now claims had been already paid by her husband.

233—11

This suit was commenced July 17, 1899. The declaration was amended in February, 1906, and the case was tried in June of the same year. There is nothing before us to indicate the cause of this delay. Appellee pleaded, in addition to the general issue, a release by appellant, for $2500, of all claims under the policy; that the policy was issued in consideration of a written application by the insured, which appellee's officers, after the death of the insured, were led by certain information to believe contained divers false representations; that appellee in good faith believed it had a complete defense to all claims and entered into the agreement with appellant to compromise said claims for $2500, which sum was paid in full satisfaction of all claims and the policy surrendered. After both parties had introduced their evidence, the jury, under an instruction from the court, returned a verdict in favor of appellee. At the time of the settlement appellant gave a receipt to appellee's representative, as follows:

"CHICAGO, ILL., *Nov. 18, 1898.*

"Received of the Security Mutual Life Association twenty-five hundred dollars, in full release of all claims under this policy No. 22,819 on the life of William S. Jackson.

ISABELLA H. JACKSON, [Seal.]  
Widow of William S. Jackson,   Seal.   Beneficiary.  
....................,   Seal.  

Witness: ADELOR J. PETIT,  
        H. J. MCCORMICK."

It is admitted that the word "seal" after the name of appellant was on the receipt before she signed it, but the evidence is conflicting as to whether the scrawl or irregular ink line about the word "seal" (indicated above by brackets) was also there at that time.

CHARLES C. SPENCER, for appellant.

HENRY S. WILCOX, (FREDRIC W. JENKINS, of counsel,) for appellee.

Mr. JUSTICE CARTER delivered the opinion of the court:

William S. Jackson died on July 18, 1898, and proper proofs of his death were furnished appellee. Shortly thereafter H. J. McCormick, appellee's representative, made an investigation in Chicago and vicinity concerning the family history of Jackson, to determine the truth or falsity of certain answers in the application. While in Chicago McCormick called at the home of appellant and told her the result of his investigations. His testimony and hers do not agree as to what he said at this conversation, but it was, in effect, that he had found certain facts which showed her husband had not given truthful answers in his application, and that in all probability the full amount of the policy would not be paid. At appellant's request McCormick laid the situation before her attorney. It appears that he had more than one conference with the attorney, and he testifies that the attorney said he was consulting with an insurance lawyer to find out what should be done; that he (McCormick) finally told the attorney that while he did not have authority in the matter he would recommend a settlement for $2500. It appears from the evidence that shortly thereafter appellant met McCormick at her attorney's office to talk over the settlement. The testimony of appellant and McCormick is not in full accord as to what happened at all these interviews and her attorney was not called as a witness. At the interview in the attorney's office no settlement was made. McCormick then told appellant that he expected to leave the city on the one o'clock train that day, and she testifies that he stated that if she did not take the $2500 she would not get anything; that the president of the company was a very stern, immovable man. McCormick, on the contrary, insists he told appellant and her attorney that the only thing he could do would be to recommend that settlement and he would do his best to get it through. McCormick, at the close of the interview, went to his hotel, and shortly there-

after appellant, in company with her attorney, also went there, called him from his room and the settlement in question was made, McCormick giving them a draft, payable to appellant's order, drawn on his company and taking the receipt in question. McCormick testified that he left at once and went to the headquarters of the company in New York, where he gave an account of the entire matter, and the draft was honored and paid on its presentation.

Appellant first insists that the acceptance by a creditor, on a liquidated demand, of less than the entire amount will not constitute a defense to a suit for the balance unless paid as a compromise of a demand the validity of which is disputed in good faith. No doubt this is the general rule, and rests on the ground that the agreement for discharge of the entire debt by its part payment is without consideration. (*Ostrander* v. *Scott,* 161 Ill. 339; *Davidson* v. *Burke,* 143 id. 139.) If there be a *bona fide* dispute, however, as to the amount due, such a dispute may be the subject of a compromise and payment may be made of a certain amount in satisfaction of the entire claim. *Fire Insurance Ass.* v. *Wickham,* 141 U. S. 564.

Appellee contends, however, that said release is under seal, and that therefore, unless the signature to the instrument was procured by false representations, the question of consideration cannot be inquired into in a proceeding of this kind and the instrument can only be avoided by a proceeding in equity. The court refused to admit certain evidence offered by appellant which tended to prove that the statements made to her by appellee's agent, and which she claimed induced her to accept the $2500 and give a receipt in full, were false, and that the acceptance by appellant of a part for the whole was in no sense a compromise. Manifestly, from the evidence in this case, appellant was not deceived into signing the release under the belief that she was signing something else. This court has said that "fraud in the execution of the instrument is practiced where the in-

strument is misread to the party signing it, or where there is a surreptitious substitution of one paper for another, or where, by some other trick or device, a party is made to sign an instrument which he did not intend to execute." (*Papke* v. *Hammond Co.* 192 Ill. 631.)   Appellant understood fully the nature of the instrument that she was signing and all of its contents.   If she was induced to execute the instrument by fraud it was through fraudulent representations as to collateral matters, and therefore, if this be a sealed instrument, she must resort to a court of equity for a decree reforming or setting it aside.   *Gage* v. *Lewis,* 68 Ill. 604; *Robinson* v. *Sharp,* 201 id. 86; *Evans* v. *Edwards,* 26 id. 279.

Appellant not only insists that this is not a sealed instrument, but most strenuously insists that under a recent holding of this court (*Farmers and Mechanics Life Ass.* v. *Caine,* 224 Ill. 599,) the doctrine of the former decisions of this court as to the necessity of resorting to equity to set aside or inquire into the consideration of a sealed instrument has been overruled, or at least so distinguished as to permit, in this case, proof that this was not a *bona fide* compromise. We cannot agree with the construction placed upon this last mentioned case by counsel for appellant.   Not only were the facts there different from those in the case now under consideration, but the receipt or release in question there was not under seal, and the court clearly intended not to include a release under seal as coming within the doctrine laid down in that case, for we stated, (p. 606,) "the payment of a less sum is not a satisfaction of a larger sum, even when so received, without a release by deed."   The only inference that can be drawn from this modifying clause, "without a release by deed," must necessarily be, that if there was a release by deed the rule laid down would not apply, and this was plainly the meaning of the court in *Titsworth* v. *Hyde,* 54 Ill. 386, which the *Caine case* relied upon as authority.   Now, what is the meaning of a release

by deed? A deed has always been held to be a written instrument under seal. (*Barrett* v. *Hinckley,* 124 Ill. 32; *Barger* v. *Hobbs,* 67 id. 592; 13 Cyc. 519, and cases cited.) Clearly, this court intended to hold that when a release was under seal, which must be given with the formality and solemnity that attached by law to the execution of a deed, the rule in that case laid down would not apply. This brings us to a consideration of the question whether this was an instrument under seal.

Appellant insists that the scrawl or irregular ink mark around the word "seal" after her name on the release was placed there after she signed it. McCormick testified that he put the scrawl about the word "seal" at the same time he filled in the body of the release and dated it, and that this was done before it was signed by the appellant. Even though it should be admitted that the scrawl was placed there afterwards by a representative of appellee, such fact does not render the instrument void if the word "seal" was sufficient to constitute the instrument a sealed instrument without the necessity of a scrawl. Section 1 of chapter 29 (Hurd's Stat. 1905, p. 460,) reads: "That any instrument of writing, to which the maker shall affix a scrawl by way of seal, shall be of the same effect and obligation, to all intents, as if the same were sealed." While this statute has been frequently construed, the precise question in the form here presented has never been passed upon by this court. In *Ankeny* v. *McMahon,* 3 Scam. 12, it was held that where an instrument describes itself in the body as sealed, and the letters "L. S." are either written or printed opposite the signature, it is a sealed instrument, and that there is no substantial difference as to the validity or dignity of the instrument whether the party executing it writes his name opposite a scrawl previously written or printed or actually affixes a scrawl after signing his name. In *Davis* v. *Burton,* 3 Scam. 41, it was held that where a bond or sealed instrument purports, on its face, to be sealed by all the signers,

and there are several seals attached but not so many as there are names, the court will presume that each signer has adopted some one of the seals already attached.   To the same effect is *Ryan* v. *Cooke,* 172 Ill. 302.   (See, also, *Eames* v. *Preston,* 20 Ill. 389.)   The recital of the seal is not essential.   If the instrument be actually sealed it will operate as such without the recital, and the general rule is, that if there is no seal at the end the instrument will not be held to be a specialty, although the parties in the body of the writing make mention of a seal.   2 Bouvier's Law Dic.—Rawle's rev.—p. 1020;  9 Am. & Eng. Ency. of Law,—2d ed.—p. 147, and cases cited.

Appellant contends that our statute on this subject having been adopted substantially from that of Virginia, it must be presumed we adopted the construction given by the courts of that State up to the time the statute was adopted; that the courts of Virginia had held that an instrument such as this, even with a scrawl about the word "seal" but which did not term itself in the body of the instrument as a sealed instrument, was not one.   (*Clegg* v. *Lemessurier,* 15 Gratt. 108;  *Parks* v. *Hewlett,* 9 Leigh, 511.)   This rule might obtain if this were a question of first impression and our courts had not construed the statute differently from the Virginia courts.   Moreover, a more recent decision of the highest court of that State has held that the word "seal" has the same force and effect as a scrawl, under a statute very like our own.   (*Lewis* v. *Overby,* 28 Gratt. 627.)   Considering the evidence in the most favorable light possible to appellant, our conclusion on the whole record is that this must be held a sealed instrument.

The authorities cited and relied upon by appellant that a release under seal has no greater effect than if not under seal if the actual consideration is expressed in the instrument cannot control in this case, as the majority of those cases are clearly distinguishable both as to the facts and the law.   In the case of *Benjamin* v. *McConnel,* 4 Gilm. 536,

cited in this connection, it was admitted that the instrument was not under seal, and it was there held that the seal could be dispensed with. Nothing said in that case in any way conflicts with the conclusions heretofore announced.

What we have already said renders unnecessary a consideration of the other points raised in the case, with one exception, which requires brief mention. Appellant offered in evidence a receipt for $539 from the appellee company, dated November 17, 1897, showing that her husband had at that date paid the first premium in full. He died before another premium came due. She testified that she paid $409.68 to A. S. Rennie, local manager of appellee, shortly before her husband's death, on Rennie's statement that the original premium had not been paid in full. Rennie testified that Jackson paid the first premium in part by giving him (Rennie) his I. O. U. for $409.68, and that it was this paper of her husband Mrs. Jackson took up and paid; that the making of the I. O. U. was a personal matter between him and Jackson at the time he insured him; that he gave this I. O. U. to Mrs. Jackson when she paid him the money. Mrs. Jackson denies that she ever received the I. O. U. or that Rennie told her these facts. She admits, however, that he may have told her the $409.68 was for the balance of the first premium. It is very evident from the evidence before us that the premium in question was paid the company at the date of the receipt, and that the further transactions as to that premium constituted a personal arrangement between Rennie and Jackson. It would be, therefore, immaterial on this issue whether Jackson's I. O. U. for $409.68 was returned by Rennie to Mrs. Jackson or not. There was no error in the refusal of the circuit court to submit to the jury the evidence thereon, as appellant could have no claim for this amount against appellee company.

Finding no reversible error in the record the judgment of the Appellate Court will be affirmed.

*Judgment affirmed.*