**Bernard MARTIN and Alvin E. Shulman, co-partners, doing business as Martin Enterprises, Plaintiffs,**

**v.**

**ALCO–DEREE CO., a corporation, and William S. Deree, Defendants.**

**No. 60 C 1745.**

United States District Court

N. D. Illinois, E. D.

April 10, 1963.

Samuel D. Rothman and Thomas J. Finnegan, Korshak & Rothman, Chicago, Ill., for plaintiffs.

Joseph Fisher and Samuel R. Hassen, Fisher, Hassen & Fisher, Chicago, Ill., for defendants.

ROBSON, District Judge.

Plaintiffs, by complaint filed November 8, 1960, seek to recover $17,828.69 [1] which they allege to be still owing them as a result of the sale of steel to defendants [2] in November and December, 1959.[3] The parties, on stipulation, have submitted the cause for the Court's determination on the pleadings, interrogatories and answers, and the briefs filed on the defendants' Motion for Summary Judgment.[4]

The defendants plead an accord and satisfaction.[5] Plaintiffs challenge the validity of the accord, asserting fraud and false representations by the defendants that the steel was defective, which representations the plaintiffs relied on in executing the accord.[6] The plaintiffs claim that on May 20, 1960,[7] subsequent to the accord,[8] they learned that the rejected steel was not defective, but wholly acceptable according to *Western European standards* and could be deemed defective only under United States' standards, and that it was not until the price of steel dropped from $10.75 to $3 per hundred weight and defendants' account was six months delinquent that defendants saw fit to complain.

 While the bases for a fact conclusion in this cause are not as plentiful as could be desired, the Court is convinced that the parties intended that the steel sold should be according to American standards, not Western European standards, and therefore defendant corporation perpetrated no fraud when it advised plaintiffs the steel was defective. For that reason, plaintiffs may not now maintain that the accord is vitiated by fraud.

The defendant corporation's Purchase Order No. 8659, dated November 10, 1959, states as a "condition":

"5. Material must be as specified, prime *domestic* and free from all defects or full refund including freight and handling charges will be effected." (Emphasis supplied.)

Plaintiffs claim, however, that the *typed* portion of the order supersedes this fine *print* condition, as well as the fact that plaintiffs informed defendant corporation the steel was *foreign* steel.

*Plaintiffs' own invoice* No. 7423, dated November 30, 1959, describes the material purchased as "Open Hearth Hot Rolled Rounds *AISI* C–1035." (Emphasis supplied.) Defendants point out that AISI stands for *American* Iron and Steel Industries Standards.

Defendant corporation's Debit Memo No. 1011,[9] dated December 31, 1959, states:

"This material has carbon content ranging from .55 through .74 which was discovered by our custom-

1. Credits of $29,577.34 for check of December 10, 1959; $8,340.19 by check of June 8, 1960, and adjustment of $3,737.15. To minimize damages, plaintiffs sold the rejected steel in October, 1960, for $18,650.40, which it credited defendants.

2. The transactions were with the defendant corporation, whose obligation was guaranteed on November 2, 1959, by the individual defendant, William S. Deree.

3. 595,810 pounds on November 30, 1959; 39,320 pounds on December 12, 1959, the former for $61,070.53, and the latter for $4,226.90. The steel was sold f. o. b. port of New Orleans, La., and was delivered there by a foreign shipper. Plaintiffs point out they had not seen the steel because it was delivered direct to the defendant corporation.

4. Which was denied by the Court on September 27, 1962, there being an issue of fact.

5. By the payment of a balance of $8,340.19 and the return of 313,055 pounds of steel bars plus freight charges, aggregating $35,719.58.

6. And which defendants assert they did not find untrue until after the execution of the accord and satisfaction.

7. Plaintiffs' answer to defendants' 10/4/61 Interrogatory No. 1.

8. Plaintiffs' answer to defendants' 10/4/61 Interrogatory No. 1.

9. Plaintiffs' answer to Interrogatory No. 2, propounded by defendants on October 4, 1961, states "they have no record of ever having received defendant's Debit Memo No. 1011 of December 31, 1959."

ers production engineering process laboratory after delivery. Therefore is not as represented and purchased *AISI* C–1035.[10] Material being held in Chicago for your disposition." (Emphasis supplied.)

In support of the motion for summary judgment defendants also append correspondence and reports between the parties in respect to the defective steel bars. Defendants point out that as early as December 31, 1959, they rejected an entire shipment of 39,320# because of defective carbon content. Defendants forwarded to plaintiffs, on March 28, 1960, the findings made by the Pittsburgh Testing Laboratories,[11] stating defendants' rejection [12] of the material and requesting instruction for disposition of the steel. A letter of June 8, 1960,[13] to plaintiffs from defendants sets out the terms of the parties' accord agreement in the controversy, and a return letter of June 20, 1960, from plaintiffs to defendants, accepting the check for the agreed balance, states:

"We regret that you found this material not to be within the applicable standard tolerances * *." [14]

As defendants point out:

"The transactions and dealings between the parties covered the period from November 10, 1959 through June 8, 1960 when they settled their disputes. Plaintiffs who are steel brokers had more than ample time and opportunity during this extended period to make known to the defendants their 'foreign' position * * *. The parties dealt at arms length. There was no fraud, misstatement, intentional concealment, overreaching, or a mutual mistake of fact. Courts favor compromises of disputes and where a settlement is once shown, every presumption is indulged in its favor." [15]

Plaintiffs complain defendants' statement that "the designation AISI C–1035 on plaintiffs' confirmation of their purchase order indicates that this was intended to be a purchase of domestic steel and that AISI stands for American Iron and Steel Institute Standards" is not supported by any affidavit or other competent proof.[16]

---

Plaintiffs' later affidavit denies plaintiffs ever received defendant corporation's Debit Memo No. 1011.

10. C–1035 is stated to mean carbon content tolerance.

11. Covering the steel here involved and allegedly showing improper and substantial out of round defects. This *report*, plaintiffs claim not controlling because not based on *foreign* standards. However, plaintiffs' report received from W. Hunt Co. on July 19, 1960, showed the steel to be within acceptable foreign steel tolerances.

12. "Accordingly and as per our understanding we are rejecting the material and are waiting your instructions for disposition of same."

13. "We have today entered into an agreement with your Mr. Shulman by accepting and paying for 246,295 Lbs. or [sic] material against your invoice #7445 by issuing our check No. 1681 for $8340.19 as settlement in full of our account."

14. This same letter continues in part:
"As you know, we merely acted as brokers in this transaction and the goods, when purchased by you, were in New Orleans, at its point of arrival from Ireland, and were never actually in our possession.
"We expect to get credit from our supplier and so avoid the loss which now must be sustained by reason of today's lower market price.
"We have your check for $8,340.19 in payment of the balance of our invoice after crediting your account in the amount of your debit memorandum."

15. Citing General Discount Corporation v. Schram, D.C., 47 F.Supp. 845, 849; General Foods Corporation v. The Felipe Camarao, 2 Cir., 172 F.2d 131; Waltz v. Ellinghouse, 8 Cir., 165 F.2d 596, 597.

16. The Court, relying upon the authority of Werk v. Parker, 249 U.S. 130 (1919), at p. 133, 39 S.Ct. 197, at page 198, 63 L.Ed. 514 which states that "the court was justified in taking judicial notice of facts that appeared so abundantly from

Defendants' answers to plaintiffs' September 11, 1961, interrogatories reveal that its customer, General Motors, rejected the steel because "chemical analysis of this material [17] showed carbon content range from .55 through .74."

The affidavit of plaintiff, Bernard Martin, states that on personal knowledge, he informed defendant corporation that the steel was of foreign origin, which steel it accepted at the New Orleans' port. He further states that none of the steel was ever in plaintiffs' possession or handled by it; much of it was resold by defendant corporation to others— 312,075# of it had been resold up to June, 1960, when the price dropped from $10.75 to the $3 per hundred pounds. At that time defendant corporation had 313,055 pounds on hand in its warehouse. He goes on to say that on June 8, 1960, defendant corporation's president represented that the remaining steel was

"out of round, defective, substandard and not within the standard acceptable tolerances for such 9/16" rounds. On said date, defendant's account was six months delinquent, and plaintiffs had not yet seen said steel. Also * * * defendant informed plaintiffs it would not pay the $35,-720.09 balance of the purchase price * * * and demanded that plaintiffs accept return thereof and credit defendant's account for their value."

The affidavit of plaintiff Martin further recites:

"Relying on defendant's statements and representations * * * [plaintiffs] accepted the return of said steel and credited defendant's account * * * [which] left a balance of $8,340.19 * * *.

"Shortly after accepting the return of said bars, * * * [plaintiffs] sought to return the same to plaintiffs' supplier as defective steel and discovered, for the first time, on or about July 18, 1960, that said steel was not defective, substandard or beyond the standard acceptable tolerances for such steel, but that the same was completely in conformance with the usual and customary standards recognized and accepted for foreign steel in the steel industry."

The affidavit further states that:

" * * * [T]he steel in question was rolled with a normal rolling tolerance for round bars of 0.5 mm., as adopted by rolling mills in Western Europe; that this is the acceptable tolerance for foreign bars between 5 and 25 mm. diameter (which includes 9/16" Rounds, H.R. bars C 1035) as stipulated in 'General Export Extra Book' of 1956, published in Belgium, page B–4.

* * * * * *

" * * * [T]he carbon content of said steel was in conformance with the specification C 1035."

Plaintiffs maintain defendant corporation knowingly purchased steel measuring up only to Western European standards. Defendants, on the other hand, assert that the documentary proof is that defendant corporation believed it was purchasing steel which conformed to American standards. Therefore the steel it received was defective under the contract and there was no fraud assertable to avoid the accord and satisfaction.

Plaintiffs assert that "about July 18, 1960, when plaintiffs sought to return said steel to their European supplier, they learned for the first time that it was not defective but that it was wholly in conformance with customary standards, tolerance and carbon content recognized and accepted for foreign steel in the steel industry.

█ There is little dispute on the law of the case. An accord and satisfaction

standard works accessible in every considerable library," consulted the "Britannica Book of the Year" and found information which reveals that there is an American Iron and Steel Institute, which was organized in 1908 to promote the interests of the iron and steel industry.

17. 35,760 pounds sold December, 1959.

may be set aside for fraud. Thus it is said in Corbin on Contracts, § 1292, Vol. 6, p. 178:[18]

"Just as in the case of other contracts, an accord can be set aside, or reformed and enforced, on the ground of fraud * * * or mistake."

And in American Jurisprudence 2d, Accord and Satisfaction, § 24, it is said:

"As in the case of other contracts, a contract of accord and satisfaction may be rescinded by the parties. * * * To be valid, a contract of accord and satisfaction must have been consummated fairly and honestly; if procured by fraud, misrepresentation, duress, imposition, overreaching, * * * it is voidable at the option and instance of the aggrieved party, and may be rescinded upon discovery of the facts, provided the aggrieved party acts promptly. * * * An accord and satisfaction may be set aside in a court of equity on the ground that the parties were mutually mistaken as to the material facts * * *. However, equity will not relieve against an accord and satisfaction entered into in ignorance of the facts surrounding the transaction, where such facts could have been ascertained by the use of due diligence."

It was held in Hefter v. Cahn, 73 Ill. 296, 300 (1874), that:

"Good faith requires of the debtor, before he shall be permitted to profit by a composition agreement, that he shall make a full and fair statement of his effects, or that no concealment, deception or fraud should be practiced.

* * * * * *

"[A] fraudulent contract will not support an action, neither can it be made the foundation for a defense."

The Court said further in that case, at p. 303:

"If the composition agreement was fraudulent, that rendered it void, and appellees had the right to sue on their original account."

In Barnett v. Noble, 155 Ill.App. 129 (1910), it was held that:

"A compromise settlement or accord and satisfaction does not cease to be effective as such merely because a party making the same does not understand the effect thereof provided there is no issue of fraud."

■ The rule is stated in Illinois Law and Practice, Accord and Satisfaction, § 52:

"In the absence of a showing that an accord and satisfaction was procured by fraud or duress or was entered into and executed through mutual mistake, the courts will not go behind it and reopen the controversy which preceded it.

"On the other hand, an accord and satisfaction may be avoided, rescinded, or set aside for fraud in inducing or procuring it. * * *

* * * * * *

"* * * If a settlement has been perfected and acted on, in the absence of fraud the creditor will not be permitted to say that he did not understand the agreement as a settlement."

■ The Court concludes that there is sufficient evidence in the documents presented by the defendants to support their contention that the steel the defendant corporation purchased was to conform to the American standard, that it did not conform to that standard, that the steel was defective under the contract and properly rejected, and that there was no fraud practiced by the defendants which might vitiate the accord and satisfaction for fraud. The Court is loath to upset the parties' accord and satisfaction where

18. Papke v. Hammond, 192 Ill. 631, 61 N. E. 910 (1901); Jackson v. The Security Mutual Life Insurance Company, 233 Ill. 161, 84 N.E. 198 (1908); Reed v. Engel, 237 Ill. 628, 86 N.E. 1110 (1909).

the evidence of fraud or mutual mistake is so nebulous. Consequently, the Court finds the issues for the defendants and concludes that the Complaint should be dismissed.