## FRAZIER v. SIMS MOTOR TRANSPORT LINES, Inc.
### No. 10521.

United States Court of Appeals
Seventh Circuit.
May 22, 1952.

Frank J. Mackey, Jr., Chicago, Ill., Edward B. Casey, Chicago, Ill., for appellants.

Richard G. Finn, Chicago, Ill., for appellee.

Before KERNER, FINNEGAN and SWAIM, Circuit Judges.

SWAIM, Circuit Judge.

This is an appeal from a judgment of the District Court awarding the plaintiff, William A. Frazier, damages of $18,000.00

against the defendants, Sims Motor Transport Lines, Inc. and Modern Equipment Co., for permanent injuries suffered by the plaintiff in an accident in which his automobile, in which he was riding, was negligently struck and was knocked off the highway by the defendants' truck tractor. At the time the tractor was not pulling a trailer.

The accident occurred on February 4, 1950, near Knox, Indiana. The plaintiff's automobile at the time of the accident was being driven by plaintiff's friend, Elmer Sallee, on a two-lane highway. Roy E. Collins, the driver of the defendants' tractor, which weighed 13,000 pounds, started to pass the plaintiff's automobile but, seeing another car approaching from the opposite direction, attempted to turn back into his own lane and in doing so struck the plaintiff's car.

In the accident the plaintiff suffered several pelvic fractures. The plaintiff was taken in an ambulance, first, to the office of Dr. J. F. De Naut in Knox and, second, to the Holy Family Hospital in La Porte, Indiana. As a result of the injuries, plaintiff was in shock and had severe pain in the lower back and pelvic region. There was evidence to indicate that the plaintiff was still suffering severe pain at the time of the trial and that such pain would be permanent. X-rays taken at the hospital the morning after the accident disclosed a fracture extending the entire length of the sacrum, fractures of both rami of the right pubis and a fracture of the ischium. Plaintiff remained in the hospital for five days and was then taken by ambulance to the home of Elmer Sallee's father. When asked how he happened to leave the hospital at that time the plaintiff testified:

"Well, they were wanting me to pay; I did not have it to give them."

Thereafter plaintiff was confined to bed in Sallee's home for about six weeks, was then on crutches for about a month, and, about the third week in April 1950, returned to work at the Kingsbury Ordnance Plant where he had been employed and where he was then assigned to "light work." Plaintiff continued to work at the Ordnance Plant until September 1951. He testified that he was then told by his supervisor that he could not "do the work" and his employment was terminated. There was some evidence to support the contention of the defendants that this was not the reason for his discharge.

On April 18, 1950, the plaintiff, in consideration of $500.00 paid to him by the carrier of the liability insurance on defendant's truck, executed a release on his claim for damages. The settlement was made with the plaintiff by Arthur L. Casey, President and Manager of Northwestern Indiana Claim Service, Inc. The draft given the plaintiff by Casey was made payable to the plaintiff and to Dr. De Naut. On the same day the plaintiff received the draft he endorsed it, by his mark, to Dr. De Naut who deducted $75.00 as a fee for his medical services and gave plaintiff the balance of $425.00 in cash. The draft bore a printed form of endorsement which recited that the endorser, by signing it, acknowledged receipt and accepted the same in full settlement and final discharge of any and all claims or demands by reason of any damages, loss or personal injury sustained by the endorser in consequence of the accident occurring on February 4, 1950.

The District Court found that the plaintiff executed the release and accepted the consideration therefor, the $500.00 draft, as a result of the fraudulent misrepresentations made by Arthur L. Casey; that the plaintiff had made a tender to the defendants of the said sum of $500.00 but that the tender had been refused, and that the plaintiff was, therefore, entitled to receive from the defendants the sum of $18,000.00, the amount of his damages as found, minus the $500.00 which plaintiff had already received.

The defendants insist that the record does not disclose evidence to sustain the finding of the District Court that the release was induced and procured by the fraudulent misrepresentations of Casey, the claim adjuster. We believe the evidence fully sustains this finding.

The plaintiff, William A. Frazier, was 24 years of age at the time of the accident. He was born on a farm in Kentucky and was the youngest of nine children. He had gone to school only part time for only two

years, during the years he was 8 and 9. He was illiterate and could neither read nor write. When he was 15 he went to Indiana to work on the railroad as a section hand. He continued to work with the section gang for about six years. He then went to work at the Kingsbury Ordnance Plant, located between Knox and La Porte, Indiana, where he was an ammunition handler, helping stack ammunition in a warehouse, a job described as being "heavy work." He continued at this work until he was injured in the accident. Prior to the time of the accident he had always been strong and healthy.

On the other hand, Arthur L. Casey, the claim adjuster, who procured the release from Frazier, was a claim adjuster with many years of training and experience. He was 44 years old. He was a high school graduate, took a course at La Salle Extension University and attended John Marshall Law School where he obtained a law degree. At the time he procured the release from Frazier, Casey had been adjusting personal injury cases for 18 years. He was President and General Manager of his adjustment concern. He was then handling adjustments for more than 100 different insurance companies. Casey admitted that when he talked to Frazier he realized that Frazier was a man of very limited intelligence. Casey also admitted that prior to the time of the settlement he knew that Frazier had a lawyer, Cantwell, in Knox; that he (Casey) had talked with Cantwell about the possibility of settling Frazier's case, and that Cantwell had said that he intended to employ some firm in Chicago and did not want to talk to Casey.

On April 18, 1950, Casey, on the request of Manningly, the Safety Director of defendant Sims Motor Freight Lines, Inc., drove down to the vicinity of Knox and Bass Lake to attempt to negotiate a settlement with Frazier and Sallee. Casey was accompanied by his assistant, Fred Brasich, who was present at the trial but did not testify. On reaching the Knox community they picked up Collins, the truck driver, who took them to the vicinity of the Sallee home. There they first contacted Elmer Sallee, the driver of Frazier's car at the time of the accident, to whom Casey gave $10.00 for a release, after Sallee said that he was not injured. They waited at a nearby cross road for the return of Frazier from work. Casey testified that when Frazier arrived, about 4:30 P.M., he came over to their car and said he wanted to settle his case and said he wanted "some preposterous figure of six thousand or seven thousand dollars." Casey said he told Frazier that the case was not worth that amount of money and started to drive away when Frazier asked him to make an offer. Casey said he then totaled up the amount of Frazier's hospital and doctor bills and the time lost from work and offered Frazier $500.00. Frazier then asked him if he would make it $600.00, and on Casey's refusal to do so, Frazier turned around and talked to Goodloe Sallee for "a second or two" and then said he would take it. Casey said he then prepared the release which Goodloe Sallee read to Frazier. Casey said that Frazier then made some comment about Dr. De Naut, about having not been hurt, and asked Casey if he had a report from Dr. De Naut. Casey said he then held a report which he had from Dr. De Naut up to the window of the automobile and Goodloe Sallee read the report to Frazier. Casey said he pointed out to Goodloe Sallee and to Frazier that the report said there was no permanent injury. In the report which Dr. De Naut had furnished to Casey's claim service the doctor had described the four pelvic fractures received by Frazier, had prescribed bed rest and a pelvic brace, but had said there would be no permanent impairment.

Collins, the truck driver, who was present during the negotiations, said that neither Goodloe Sallee nor Casey nor anyone else read to Frazier that part of Dr. De Naut's report which described the pelvic fractures. Collins testified that when Frazier asked something about broken bones, Casey replied:

> "Well, I don't know whether you have or not. All I have is a report from Dr. De Naut."

Collins also said that at the time of the negotiation of the settlement there was talk

by one of the Sallees about Frazier's lawyers in which one of them said:

"* * * that it was a big lawyer— it was a lawyer in Chicago. The main lawyer was the lawyer in Chicago."

Collins also testified that during this conversation Frazier said to Casey:

"I think you have got those people bought up up there. I am going to settle. I will get that much anyway."

Elmer Sallee testified that when Frazier arrived home from work Collins introduced Frazier to Casey and explained that Casey was the insurance man and the man with whom to settle. Sallee said that Frazier told Casey that he would have to have $10,000.00 and that at this Casey laughed like it was a big joke. Sallee said that Casey did some figuring and then told Frazier that the most he could get out of it in court was $600.00, and that if he went to court the lawyers and the doctor would take it all and that Frazier would get nothing. Sallee also said that Casey also told Frazier:

"Furthermore, I have got the papers from the hospital and Dr. De Naut showing that you weren't hurt. No bones broken at all, just kind of bruised up a little bit, just enough to be sore for a few days."

Sallee testified further that when Casey said that, Frazier said:

"The doctor lies when he says I haven't been hurt."

Frazier also testified that Casey had told him that he (Casey) had papers from the Holy Family Hospital and from Dr. De Naut showing that he (Frazier) was not hurt, and that Casey further said "that Dr. De Naut is an old, good friend, went to school, and they were friends, and he would tell me." Frazier said that he believed Casey when Casey told him that the most he could get was $600.00 and when he said that he had a statement from the hospital and from the doctor showing that Frazier wasn't hurt. Frazier said that he would not have settled his case if he had not believed these statements by Casey. Frazier

explained the fact that he did not ask Dr. De Naut about the doctor's purported statement by saying that when he went to the doctor's office, the doctor was too busy to talk; that the doctor had an office full of people waiting and that one man was there with his fingers off; and that the doctor, therefore, rushed Frazier out of his office as soon as he could.

Casey admitted that in his conversation with Frazier, Frazier had asked: "Why was it that the doctor said I wasn't hurt." Casey said that Frazier was the first one to mention such a statement by the doctor and that he (Casey) did not know how Frazier got such an impression. It is much easier to believe the testimony of Sallee and Frazier that this question, or some such statement by Frazier, was induced by a statement from Casey that the doctor had indicated in his report that Frazier was not hurt.

■ When we consider the vast difference in the intelligence, education, background, training and experience of these two men, Casey and Frazier, and then consider all of the testimony and other evidence concerning the settlement they negotiated, we find it difficult to escape the conclusion that the skilled claim adjuster resorted to statements which he knew were false in order to induce the illiterate laborer, for a grossly inadequate consideration, to release his claim. Again, bearing in mind Frazier's lack of education and experience, it is easy to understand how Frazier, as he said, believed these false statements and was thereby induced to make the settlement. To establish a claim in court Frazier would have to prove his injuries. If he could procure no such evidence from the hospital nor from the doctor his chances for more than nominal damages would be slight.

■■ Since all matters concerning this release occurred in Indiana, we must look to the substantive law of Indiana to determine the question of its validity. Woodbury v. United States Casualty Co., 284 Ill. 227, 235–236, 120 N.E. 8. The Indiana Supreme Court in Indiana Insurance Co. v. Hand-

lon, 216 Ind. 442, 446, 24 N.E.2d 1003, 1005, held that:

> "A release of a claim for personal injuries may be avoided if it is executed in reliance upon misrepresentations as to the nature or extent of the injuries, amounting to fraud on the part of the releasee or his agent."

To the effect that this is also general law see 45 Am.Jur., page 686, Sec. 21.

■ The defendants rely particularly on two Indiana decisions, Automobile Underwriters, Inc., v. Rich, 222 Ind. 384, 53 N.E.2d 775, and Ayres v. Moore, 118 Ind.App. 289, 78 N.E.2d 463. In each of those cases there was an entirely different factual situation from that with which we are here confronted. However, the essential elements which, according to those cases, must be shown by the evidence in order to invalidate a transaction for fraud could all properly be found from the evidence in the instant case. Casey's assertions that he had statements from Dr. De Naut and from the hospital showing that Frazier was not hurt but was only bruised, just enough to be sore for a few days, and his statements that if the case went to court, $600.00 would be the most Frazier could get and that the lawyers and doctor would get all of that, were statements relating to a material fact —the value of Frazier's claim. These statements were false, were known by Casey to be false, and were made for the purpose of inducing Frazier to settle. The illiterate and inexperienced Frazier was ignorant of the fact that these statements were false and, relying on them, he was induced to act. Under these circumstances Frazier executed the release and endorsed the draft, releasing for $500.00 his claim which was found by the District Court to be worth $18,000.00, thereby being damaged in the amount of $17,500.00 if the release were held valid.

■ But, the defendants say, at the time Frazier endorsed the draft and thereby signed the release on the back of the draft, there was no agent of defendants present and there was no evidence that this release was procured by fraud. The evidence is clear that the plaintiff took this draft, the same evening he received it, to Dr. De Naut's office where he cashed it. It was also shown that because of an emergency case in his office Dr. De Naut did not have time to talk to Frazier. We have here merely the second step in the settlement, Frazier's cashing the draft and receiving the money, $500.00 minus the amount he owed the doctor. The Court properly found that this second step was also the result of the fraudulent misrepresentations of Casey.

■ Defendants urge that we should scan this record carefully for error because, they say, the damages assessed by the Court are excessive. Although we have carefully examined the record it was not done because we considered the damages excessive. The Trial Judge found the damages to be $18,000.00. In view of the testimony of the doctors describing the type and permanency of plaintiff's injuries, we think the amount of damages awarded was conservative.

The judgment of the District Court is affirmed.