# NADER *v.* ALLEGHENY AIRLINES, INC.

No. 75–455.   Argued March 24, 1976—Decided June 7, 1976

POWELL, J., delivered the opinion for a unanimous Court. WHITE, J., filed a concurring opinion, *post,* p. 308.

*Reuben B. Robertson III* argued the cause for petitioner. With him on the briefs was *Alan B. Morrison.*

*E. Barrett Prettyman, Jr.,* argued the cause for re-

spondent. With him on the briefs were *Frank F. Roberson* and *William A. Bradford, Jr.*[*]

MR. JUSTICE POWELL delivered the opinion of the Court.

In this case we address the question whether a common-law tort action based on alleged fraudulent misrepresentation by an air carrier subject to regulation by the Civil Aeronautics Board (Board) must be stayed pending reference to the Board for determination whether the practice is "deceptive" within the meaning of § 411 of the Federal Aviation Act of 1958, 72 Stat. 769, 49 U. S. C. § 1381. We hold that under the circumstances of this case a stay pending reference is inappropriate.

## I

The facts are not contested. Petitioner agreed to make several appearances in Connecticut on April 28, 1972, in support of the fundraising efforts of the Connecticut Citizen Action Group (CCAG), a nonprofit public interest organization. His two principal appearances were to be at a noon rally in Hartford and a later address at the Storrs campus of the University of Connecticut. On April 25, petitioner reserved a seat on respondent's flight 864 for April 28. The flight was scheduled to leave Washington, D. C., at 10:15 a. m. and to arrive in Hartford at 11:15 a. m. Petitioner's ticket was purchased from a travel agency on the morning of the flight. It indicated, by the standard "OK" notation, that the reservation was confirmed.

Petitioner arrived at the boarding and check-in area approximately five minutes before the scheduled depar-

---

[*]*Donald C. Comlish* and *Robert Glasser* filed a brief for the Air Transport Association of America as *amicus curiae*.

ture time. He was informed that all seats on the flight were occupied and that he, like several other passengers who had arrived shortly before him, could not be accommodated. Explaining that he had to arrive in Hartford in time for the noon rally, petitioner asked respondent's agent to determine whether any standby passengers had been allowed to board by mistake or whether anyone already on board would voluntarily give up his or her seat. Both requests were refused. In accordance with respondent's practice, petitioner was offered alternative transportation by air taxi to Philadelphia, where connections could be made with an Allegheny flight scheduled to arrive in Hartford at 12:15 p. m. Fearing that the Philadelphia connection, which allowed only 10 minutes between planes, was too close, petitioner rejected this offer and elected to fly to Boston, where he was met by a CCAG staff member who drove him to Storrs.

Both parties agree that petitioner's reservation was not honored because respondent had accepted more reservations for flight 864 than it could in fact accommodate. One hour prior to the flight, 107 reservations had been confirmed for the 100 seats actually available. Such overbooking is a common industry practice, designed to ensure that each flight leaves with as few empty seats as possible despite the large number of "no-shows"—reservation-holding passengers who do not appear at flight time. By the use of statistical studies of no-show patterns on specific flights, the airlines attempt to predict the appropriate number of reservations necessary to fill each flight. In this way, they attempt to ensure the most efficient use of aircraft while preserving a flexible booking system that permits passengers to cancel and change reservations without notice or penalty. At times the practice of overbooking results

in oversales, which occur when more reservation-holding passengers than can be accommodated actually appear to board the flight. When this occurs, some passengers must be denied boarding ("bumped"). The chance that any particular passenger will be bumped is so negligible that few prospective passengers aware of the possibility would give it a second thought. In April 1972, the month in which petitioner's reservation was dishonored, 6.7 confirmed passengers per 10,000 enplanements were denied boarding on domestic flights.[1] For all domestic airlines, oversales resulted in bumping an average of 5.4 passengers per 10,000 enplanements in 1972, and 4.6 per 10,000 enplanements in 1973.[2] In domestic operations respondent oversold 6.3 seats per 10,000 enplanements in 1972 and 4.5 seats per 10,000 enplanements in 1973.[3] Thus, based on the 1972 experience of all domestic airlines, there was only slightly more than one chance in 2,000 that any particular passenger would be bumped on a given flight.[4] Nevertheless, the total number of confirmed ticket holders denied seats is quite substantial, numbering over 82,000 passengers in 1972 and about 76,000 in 1973.[5]

Board regulations require each airline to establish priority rules for boarding passengers and to offer "denied boarding compensation" to bumped passengers. These "liquidated damages" are equal to the value of the passenger's ticket with a $25 minimum and a $200 maximum. 14 CFR § 250.5 (1975). Passengers are free to reject the compensation offered in favor of a common-

---

[1] Brief for Civil Aeronautics Board as *Amicus Curiae* filed in Court of Appeals, App. B, p. 58.

[2] *Id.,* at 50

[3] *Id.,* at 51.

[4] On any given flight, of course, the chance that a passenger will be bumped may be higher or lower than the overall average.

[5] *Id.,* at 50.

law suit for damages suffered as a result of the bumping. Petitioner refused the tender of denied boarding compensation ($32.41 in his case) and, with CCAG, filed this suit for compensatory and punitive damages. His suit did not seek compensation for the bumping *per se* but asserted two other bases of liability: a common-law action based on fraudulent misrepresentation arising from respondent's alleged failure to inform petitioner in advance of its deliberate overbooking practices, and a statutory action under § 404 (b) of the Act, 49 U. S. C. § 1374 (b),[6] arising from respondent's alleged failure to afford petitioner the boarding priority specified in its rules filed with the Board under 14 CFR § 250.3 (1975).

The District Court entered a judgment for petitioner on both claims, awarding him a total of $10 in compensatory damages and $25,000 in punitive damages. Judgment also was entered for CCAG on its misrepresentation claim, with an award of $51 in compensatory damages and $25,000 in punitive damages.

The Court of Appeals for the District of Columbia Circuit reversed. 167 U. S. App. D. C. 350, 512 F. 2d 527 (1975). A number of its rulings were not presented to this Court in the petition for certiorari. The award of damages to CCAG was reversed on the ground that the organization was too "remote from the transaction" to fall "within the class of persons who may recover." *Id.*, at 372, 512 F. 2d, at 549. The merits of petitioner's statutory claim were remanded for fur-

---

[6] Section 404 (b) provides:

"No air carrier or foreign air carrier shall make, give, or cause any undue or unreasonable preference or advantage to any particular person, port, locality, or description of traffic in air transportation in any respect whatsoever or subject any particular person, port, locality, or description of traffic in air transportation to any unjust discrimination or any undue or unreasonable prejudice or disadvantage in any respect whatsoever."

ther findings. The award of punitive damages to petitioner on the statutory claim was reversed on the ground that respondent's conduct contained no "elements of intentional wrongdoing or conscious disregard for" petitioner's rights. *Id.*, at 373, 512 F. 2d, at 550. The question of punitive damages for the common-law claim was remanded for further findings on respondent's good faith. In particular, the trial court was to consider "whether Allegheny reasonably believed that its policies were completely lawful and in fact carried the approval of the Board." *Id.*, at 374, 512 F. 2d, at 551. None of these rulings was presented to this Court in the petition for certiorari.

The only issue before us concerns the Court of Appeals' disposition on the merits of petitioner's claim of fraudulent misrepresentation. Although the court rejected respondent's argument that the existence of the Board's cease-and-desist power under § 411 of the Act eliminates all private remedies for common-law torts arising from unfair or deceptive practices by regulated carriers, it held that a determination by the Board that a practice is not deceptive within the meaning of § 411 would, as a matter of law, preclude a common-law tort action seeking damages for injuries caused by that practice.[7] Therefore, the court held that the Board must be

---

[7] Section 411 provides in full:

"The Board may, upon its own initiative or upon complaint by any air carrier, foreign air carrier, or ticket agent, if it considers that such action by it would be in the interest of the public, investigate and determine whether any air carrier, foreign air carrier, or ticket agent has been or is engaged in unfair or deceptive practices or unfair methods of competition in air transportation or the sale thereof. If the Board shall find, after notice and hearing, that such air carrier, foreign air carrier, or ticket agent is engaged in such unfair or deceptive practices or unfair methods of competition, it shall order such air carrier, foreign air carrier, or ticket agent to cease and desist from such practices or methods of competition."

allowed to determine in the first instance whether the challenged practice (in this case, the alleged failure to disclose the practice of overbooking) falls within the ambit of § 411. The court took judicial notice that a rulemaking proceeding concerning possible changes in reservation practices in response to the 1973–1974 fuel crisis was already underway and that a challenge to the carriers' overbooking practices had been raised by an intervenor in that proceeding.[8] The District Court was instructed to stay further action on petitioner's misrepresentation claim pending the outcome of the rulemaking proceeding. The Court of Appeals characterized its holding as "but another application of the principles of primary jurisdiction, a doctrine whose purpose is the coordination of the workings of agency and court." 167 U. S. App. D. C., at 367, 512 F. 2d, at 544.

---

[8] The rulemaking proceedings were initiated in January 1974. Emergency Reservation Practices Investigation, 39 Fed. Reg. 823 (1974) (CAB Order 73–12–93, EDR–260). An opinion and an order were issued on April 13, 1976. Emergency Reservation Practices Investigation (CAB Order 76–4–55). The Board concluded that the questions raised by the Court of Appeals in this case were "outside the scope of [the] investigation." *Id.*, at 7. It specifically noted that "the question of whether intentional overbooking, in general, or nondisclosure of such practice, in particular, is a deceptive trade practice" was not at issue. *Id.*, at 8.

In April 1976 the Board announced a proposed rulemaking proceeding with respect to deliberate overbooking and oversales. Priority Rules, Denied-Boarding Compensation Tariffs and Reports of Unaccommodated Passengers: Reexamination of the Board's Policies Concerning Deliberate Overbooking and Oversales, 41 Fed. Reg. 16478 (1976) (CAB Order EDR–296). The Board has decided to re-evaluate existing practices in light of a recent "trend toward a higher rate of oversales" and in light of the fact that oversales "continue to be a significant cause of [consumer] complaints." *Ibid.* Among the options to be considered is a requirement that the practice of deliberate overbooking, if allowed to continue, be disclosed to customers. *Id.*, at 16479.

## II

The question before us, then, is whether the Board must be given an opportunity to determine whether respondent's alleged failure to disclose its practice of deliberate overbooking is a deceptive practice under § 411 before petitioner's common-law action is allowed to proceed.   The decision of the Court of Appeals requires the District Court to stay the action brought by petitioner in order to give the Board an opportunity to resolve the question.   If the Board were to find that there had been no violation of § 411, respondent would be immunized from common-law liability.

### A

Section 1106 of the Act, 49 U. S. C. § 1506, provides that "[n]othing contained in this chapter shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this chapter are in addition to such remedies."   The Court of Appeals found that "although the saving clause of section 1106 purports to speak in absolute terms it cannot be read so literally."   167 U. S. App. D. C., at 367, 512 F. 2d, at 544.   In reaching this conclusion, it relied on *Texas & Pacific R. Co.* v. *Abilene Cotton Oil Co.*, 204 U. S. 426 (1907).   In that case, the Court, despite the existence of a saving clause virtually identical to § 1106, refused to permit a state-court common-law action challenging a published carrier rate as "unjust and unreasonable."   The Court conceded that a common-law right, even absent a saving clause, is not to be abrogated "unless it be found that the preexisting right is so repugnant to the statute that the survival of such right would in effect deprive the subsequent statute of its efficacy; in other words, render its provisions nugatory."   204 U. S., at 437.   But the Court found that

the continuance of private damages actions attacking the reasonableness of rates subject to the regulation of the Interstate Commerce Commission would destroy the purpose of the Interstate Commerce Act, which was to eliminate discrimination by requiring uniform rates. The saving clause, the Court found, "cannot in reason be construed as continuing in shippers a common law right, the continued existence of which would be absolutely inconsistent with the provisions of the act. In other words, the act cannot be held to destroy itself." *Id.*, at 446.[9]

In this case, unlike *Abilene,* we are not faced with an irreconcilable conflict between the statutory scheme and the persistence of common-law remedies. In *Abilene* the carrier, if subject to both agency and court sanctions, would be put in an untenable position when the agency and a court disagreed on the reasonableness of a rate. The carrier could not abide by the rate filed with the Commission, as required by statute, and also comply with a court's determination that the rate was excessive. The conflict between the court's common-law authority and the agency's ratemaking power was direct and unambiguous. The court in the present case, in contrast, is not called upon to substitute its judgment for the agency's on the reasonableness of a rate—or, indeed, on

---

[9] The Court later described the saving clause discussed in *Abilene* as follows:

"That proviso was added at the end of the statute,—not to nullify other parts of the Act, or to defeat rights or remedies given by preceding sections,—but to preserve all existing rights which were not inconsistent with those created by the statute. It was also intended to preserve existing remedies, such as those by which a shipper could, in a state court, recover for damages to property while in the hands of the interstate carrier; damages caused by delay in shipment; damages caused by failure to comply with its common law duties and the like." *Pennsylvania R. Co.* v. *Puritan Coal Mining Co.,* 237 U. S. 121, 129–130 (1915).

the reasonableness of any carrier practice. There is no Board requirement that air carriers engage in overbooking or that they fail to disclose that they do so. And any impact on rates that may result from the imposition of tort liability or from practices adopted by a carrier to avoid such liability would be merely incidental. Under the circumstances, the common-law action and the statute are not "absolutely inconsistent" and may coexist, as contemplated by § 1106.

## B

Section 411 of the Act allows the Board, where "it considers that such action . . . would be in the interest of the public," "upon its own initiative or upon complaint by any air carrier, foreign air carrier, or ticket agent," to "investigate and determine whether any air carrier . . . has been or is engaged in unfair or deceptive practices or unfair methods of competition . . . ." Practices determined to be in violation of this section "shall" be the subject of a cease-and-desist order. The Court of Appeals concluded—and respondent does not challenge the conclusion here—that this section does not totally preclude petitioner's common-law tort action. But the Court of Appeals also held, relying on the nature of the airline industry as "a regulated system of limited competition," *American Airlines, Inc.* v. *North American Airlines, Inc.,* 351 U. S. 79, 84 (1956), and the Board's duty to promote "adequate, economical, and efficient service," § 102 (c) of the Act, 49 U. S. C. § 1302 (c), "at the lowest cost consistent with the furnishing of such service," § 1002 (e)·(2) of the Act, 49 U. S. C. § 1482 (e) (2), that the Board has the power in a § 411 proceeding to approve practices that might otherwise be considered deceptive and thus to immunize carriers from common-law liability. 167 U. S. App. D. C., at 366, 512 F. 2d, at 543.

We cannot agree. No power to immunize can be derived from the language of § 411. And where Congress has sought to confer such power it has done so expressly, as in § 414 of the Act, 49 U. S. C. § 1384, which relieves those affected by certain designated orders (not including orders issued under § 411) "from the operations of the 'antitrust laws.' " When faced with an exemptive provision similar to § 414 in *United States Navigation Co.* v. *Cunard S. S. Co.,* 284 U. S. 474 (1932), this Court dismissed an antitrust action because initial consideration by the agency had not been sought. The Court pointed out that the Act in question was "restrictive in its operation upon some of the activities of common carriers . . . , and permissive in respect of others." *Id.,* at 485. See also *Far East Conference* v. *United States,* 342 U. S. 570 (1952). Section 411, in contrast, is purely restrictive. It contemplates the elimination of "unfair or deceptive practices" that impair the public interest. Its role has been described in *American Airlines, Inc.* v. *North American Airlines, Inc., supra,* at 85:

> " 'Unfair or deceptive practices or unfair methods of competition,' as used in § 411, are broader concepts than the common-law idea of unfair competition. . . . The section is concerned not with punishment of wrongdoing or protection of injured competitors, but rather with protection of the public interest."

As such, § 411 provides an injunctive remedy for vindication of the public interest to supplement the compensatory common-law remedies for private parties preserved by § 1106.[10]

---

[10] Cf. *Federal Trade Comm'n* v. *Klesner,* 280 U. S. 19, 25–26 (1929); *Holloway* v. *Bristol-Myers Corp.,* 158 U. S. App. D. C. 207, 212, 485 F. 2d 986, 991 (1973) (both opinions discuss § 5 of the Federal Trade Commission Act, 38 Stat. 717, as amended, 15 U. S. C. § 45, which this Court, in *American Airlines, Inc.* v. *North*

Thus, a violation of § 411, contrary to the Court of Appeals' conclusion, is not coextensive with a breach of duty under the common law. We note that the Board's jurisdiction to initiate an investigation under § 411 is expressly premised on a finding that the "public interest" is involved. The Board "may not employ its powers to vindicate private rights." 351 U. S., at 83. Indeed, individual consumers are not even entitled to initiate proceedings under § 411, a circumstance that indicates that Congress did not intend to require private litigants to obtain a § 411 determination before they could proceed with the common-law remedies preserved by § 1106. Cf. *Rosado* v. *Wyman,* 397 U. S. 397, 406 (1970).

Section 411 is both broader and narrower than the remedies available at common law. A cease-and-desist order may issue under § 411 merely on the Board's conclusion, after an investigation determined to be in the public interest, that a carrier is engaged in an "unfair or deceptive practice." No findings that the practice was intentionally deceptive or fraudulent or that it in fact has caused injury to an individual are necessary. *American Airlines, Inc.* v. *North American Airlines, Inc., supra,* at 86. On the other hand, a Board decision that a cease-and-desist order is inappropriate does not represent approval of the practice under investigation. It may merely represent the Board's conclusion that the serious prohibitory sanction of a cease-and-desist order is inappropriate, that a more flexible approach is necessary. A wrong may be of the sort that calls for compensation to an injured individual without requiring the extreme remedy of a cease-and-desist order. Indeed, the Board,

---

*American Airlines, Inc.,* 351 U. S., at 82, described as the model for § 411).

in dealing with the problem of overbooking by air carriers, has declined to issue cease-and-desist orders, despite the determination by an examiner in one case that a § 411 violation had occurred.[11]   Instead, the Board has elected to establish boarding priorities and to ensure that passengers will be compensated for being bumped either by a liquidated sum under Board regulations or by resort to a suit for compensatory damages at common law.[12]

In sum, § 411 confers upon the Board a new and powerful weapon against unfair and deceptive practices that injure the public.  But it does not represent the only, or best, response to all challenged carrier actions that result in private wrongs.

## C

The doctrine of primary jurisdiction "is concerned with promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties."   *United States* v. *Western Pacific R. Co.*, 352 U. S. 59, 63 (1956).   Even when common-law rights and remedies survive and the agency in question lacks the power to confer immunity from common-law liability, it may be appropriate to refer specific issues to an agency for initial determination where that procedure would secure "[u]niformity and

---

[11] In the late 1950's, § 411 investigations were initiated against two carriers charged with deliberate overbooking.  One of these investigations was terminated on the ground that the record showed no deliberate overbooking by the carrier. *Eastern Air Lines Overbooking Enforcement Proceeding*, 30 C. A. B. 862 (1960). The other was terminated, after a finding by the examiner of a § 411 violation, in favor of an industrywide investigation. *National Airlines, Inc., Enforcement Proceeding*, 31 C. A. B. 390 (1960).

[12] See nn. 15–18 and accompanying text, *infra*.

consistency in the regulation of business entrusted to a particular agency" or where

> "the limited functions of review by the judiciary [would be] more rationally exercised, by preliminary resort for ascertaining and interpreting the circumstances underlying legal issues to agencies that are better equipped than courts by specialization, by insight gained through experience, and by more flexible procedure." *Far East Conference* v. *United States*, 342 U. S., at 574–575.

See also *United States* v. *Western Pacific R. Co., supra,* at 64.

The doctrine has been applied, for example, when an action otherwise within the jurisdiction of the court raises a question of the validity of a rate or practice included in a tariff filed with an agency, *e. g., Danna* v. *Air France,* 463 F. 2d 407 (CA2 1972); *Southwestern Sugar & Molasses Co.* v. *River Terminals Corp.,* 360 U. S. 411, 417–418 (1959), particularly when the issue involves technical questions of fact uniquely within the expertise and experience of an agency—such as matters turning on an assessment of industry conditions, *e. g., United States* v. *Western Pacific R. Co., supra,* at 66–67. In this case, however, considerations of uniformity in regulation and of technical expertise do not call for prior reference to the Board.

Petitioner seeks damages for respondent's failure to disclose its overbooking practices. He makes no challenge to any provision in the tariff, and indeed there is no tariff provision or Board regulation applicable to disclosure practices.[13] Petitioner also makes no chal-

---

[13] In 1965, the Board proposed a rule requiring carriers to notify individual passengers of overbooked conditions 12 hours prior to the scheduled departure time. Passenger Priorities and Overbooked

lenge, comparable to those made in *Southwestern Sugar & Molasses Co.* v. *River Terminals Corp., supra,* and *Lichten* v. *Eastern Airlines, Inc.,* 189 F. 2d 939 (CA2 1951), to limitations on common-law damages imposed through exculpatory clauses included in a tariff.

Referral of the misrepresentation issue to the Board cannot be justified by the interest in informing the court's ultimate decision with "the expert and specialized knowledge," *United States* v. *Western Pacific R. Co., supra,* at 64, of the Board. The action brought by petitioner does not turn on a determination of the reasonableness of a challenged practice—a determination that could be facilitated by an informed evaluation of the economics or technology of the regulated industry. The standards to be applied in an action for fraudulent misrepresentation are within the conventional competence of the courts, and the judgment of a technically

Flights: Notice of Proposed Rule Making, 30 Fed. Reg. 13236 (1965) (CAB Order EDR–95). This proposal subsequently was abandoned after industry opposition on the ground that it was excessively rigid and unworkable. Priority Rules, Denied Boarding Compensation Tariffs, And Reports of Unaccommodated Passengers: Notice of Proposed Rule Making, 32 Fed. Reg. 459, 460–461 (1967) (CAB Order EDR–109).

The Board's abandonment of this proposal cannot be read as blanket approval of failure to make a public disclosure of overbooking practices. The cost of an individual notification program in terms of expense, public relations, and passenger confusion could be prohibitive. But alternative means of disclosure may be significantly less disruptive. Petitioner suggests, for example, that carrier overbooking practices be included in tariffs, which are required to be available for public inspection. And the Board has approved an innovative approach suggested by Eastern Air Lines, which provides for a system of limited overbooking in which passengers subject to possible denial of boarding are advised at the outset of their status. See *Delta Air Lines, Inc.* v. *CAB,* 147 U. S. App. D. C. 272, 455 F. 2d 1340 (1971) (aff'g CAB Order 71–6–120).

expert body is not likely to be helpful in the application of these standards to the facts of this case.[14]

We are particularly aware that, even where the wrong sought to be redressed is not misrepresentation but bumping itself, which has been the subject of Board consideration and for which compensation is provided in carrier tariffs, the Board has contemplated that there may be individual adjudications by courts in common-law suits brought at the option of the passenger. The present regulations dealing with the problems of overbooking and oversales were promulgated by the Board in 1967. They provide for denied boarding compensation to bumped passengers and require each carrier to establish priority rules for seating passengers and to file reports of passengers who could not be accommodated.[15] The order instituting these regulations contemplates that the bumped passenger will have a choice between accepting denied boarding compensation as "liquidated damages for all damages incurred . . . as a result of the carrier's failure to provide the passenger with confirmed reserved space," or pursuing his or her common-law remedies.[16] The Board specifically pro-

---

[14] For example, if respondent's overbooking practices were detailed in its tariff and therefore available to the public, a court presented with a claim of misrepresentation based on failure to disclose need not make prior reference to the Board, as it should if presented with a suit challenging the reasonableness of practices detailed in a tariff. Rather, the court could, applying settled principles of tort law, determine that the tariff provided sufficient notice to the party who brought the suit—as, indeed, petitioner suggests it would. Reply Brief for Petitioner 3–4, n. 3.

[15] Priority Rules, Denied Boarding Compensation Tariffs and Reports of Unaccommodated Passengers, 32 Fed. Reg. 11939 (1967) (CAB Order ER–503). See 14 CFR § 250.1 *et seq.* (1975).

[16] CAB Order ER–503, *supra,* 32 Fed. Reg. 11943.

vided for a 30-day period before the specified compensation need be accepted so that the passenger will not be forced to make a decision before "the consequences of denied boarding have occurred and are known." [17] After evaluating the consequences, passengers may choose as an alternative "to pursue their remedy under the common law." [18]

## III

We conclude that petitioner's tort action should not be stayed pending reference to the Board and accordingly the decision of the Court of Appeals on this issue is reversed. The Court of Appeals did not address the ques-

---

[17] *Id.*, at 11942.

[18] Foreign Air Carriers: Priority Rules, Denied Boarding Compensation Tariffs and Reports of Unaccommodated Passengers, 38 Fed. Reg. 15083, 15084 (1973) (CAB Order EDR-248) (amending existing regulations to include foreign air carriers). See also testimony of Jerome F. Huisentruit, assistant general counsel for the Air Transport Association of America and respondent's witness on Board jurisdiction, App. 72–73.

The contemplation that common-law remedies will continue to exist is in conformance with longstanding Board policy dating back at least to the Board's approval in 1962 of an industry agreement covering trunk carriers and calling for ticketing time limits and reservation charges in combination with a provision for denied boarding compensation. See *Domestic Trunklines, Tariff Agreement,* 35 C. A. B. 881 (1962) (CAB Order E-18064). The Board specifically rejected the carriers' proposal that the denied boarding compensation be made an exclusive remedy:

"[T]o the extent that the proposed tariff provision is designed to restrict a passenger from seeking damages to which he would otherwise be entitled under the common law, we find it to be adverse to the public interest. Accordingly, we shall condition our approval of the agreement to make clear that the prescribed penalty is a minimum obligation of the carrier which, only if accepted by the passenger, would terminate the carrier's obligation." *Id.*, at 882–883.

tion whether petitioner had introduced sufficient evidence to sustain his claim. We remand the case for consideration of that question and for further proceedings consistent with this opinion.[19]

*It is so ordered.*

Mr. Justice White, concurring.

I join the Court's opinion with these additional words.

It may be that under its rulemaking authority the Board would have power to order airline overbooking and to pre-empt recoveries under state law for undisclosed overbooking or for overselling. But it has not done so, at least as yet. It is also unnecessary to stay proceedings on the present state-law claim pending Board action under § 411. Neither an order denying nor one granting relief under that section would foreclose claims based on state law; and there is not present here the additional consideration that a § 411 proceeding would be helpful in resolving, or affecting in some manner, the state-law claim for compensatory and punitive damages. Cf. *Ricci* v. *Chicago Mercantile Exchange,* 409 U. S. 289 (1973); *Chicago Mercantile Exchange* v. *Deak-*

---

[19] The Court of Appeals specifically remanded for reconsideration of the award of punitive damages on petitioner's claim of fraudulent misrepresentation. The propriety of that ruling was not challenged in this Court.

As the issues of ultimate liability and damages are not before us, we express no opinion as to their merits. We conclude above that mere compliance with agency regulations is not sufficient in itself under the Act to exempt a carrier from common-law liability. We make clear, however, that this conclusion is not intended to foreclose the courts on remand from considering, in relation to other issues in the case, evidence that the Board was fully advised of the practice complained of, and that the carrier had cooperated with the Board.

*tor,* 414 U. S. 113 (1973). I seriously doubt that any pending or future § 411 case would reveal anything relevant to this case about the Board's view of the propriety of overbooking and of overselling that is not already apparent from prior proceedings concerning those subjects.