Sherri ROMAN et al., Plaintiffs,

v.

DELTA AIR LINES, INC., a Foreign Corporation, Defendant.

No. 75 C 1709.

United States District Court, N. D. Illinois, E. D.

Nov. 2, 1977.

Sherman L. Lewis, Chicago, Ill., for plaintiffs.

Lord, Bissell & Brook, Chicago, Ill., for defendant.

## Memorandum

LEIGHTON, District Judge.

This is a suit against an airline to recover $251,500 in actual and punitive damages for an alleged violation of section 404(b) of the Federal Aviation Act of 1958, 49 U.S.C. § 1374(b), intentional infliction of mental anguish caused by breach of a contract to provide travel accommodations, and fraudulent misrepresentation concerning the airlines' ability to perform its duties as a common carrier. The complaint was filed originally in the Circuit Court of Cook County; but pursuant to 28 U.S.C. § 1441(b), the case was removed to this court on the ground that it involved a question governed by federal law. In addition, a claim is alleged and based on pendent jurisdiction. The cause is now before the court on defendant's motion for summary judgment. The following are the undisputed facts.

### I.

Sherri Roman is the daughter of Ann and Gabe Roman, the other plaintiffs. On the evening of February 14, 1975, she went to O'Hare Airport in Chicago to board Delta Flight 281 for Fort Lauderdale, Florida. Sherri Roman was then 20 years of age, a high school graduate with no history of emotional instability or medication for any ailment. Her ticket had been purchased by her parents through a travel agency in Skokie, Illinois. Her trip to Fort Lauderdale was to culminate in a family reunion at which the Romans were to celebrate the birthday of her maternal grandfather.

When she presented her ticket at the assigned departure gate, Sherri Roman was told by a Delta representative that Flight 281 was oversold; and, as a consequence, she could not leave on that plane. She was offered accommodations on a flight that was scheduled to depart O'Hare at 3:00 a.m. the next morning, or on another flight the

next day. However, after a long distance telephone conversation with her parents who were already in Fort Lauderdale, she declined, and told Delta agents she wanted a refund of the plane fare. Her parents had instructed her to obtain a statement from the airline that Flight 281 had been oversold. Delta agents gave her a written explanation of the "Denied Boarding Compensation" that was being offered her, and then paid her $78.70, an amount equal to the price of a one-way ticket to Fort Lauderdale. They asked her to sign a release printed on the reverse side of the refund draft which stated that she had "[r]eceived from Delta Airlines, Inc., the sum of $78.70 in full accord and satisfaction of all claims and demands which [she had] or [might] have against said company arising out of or in connection with denial of confirmed passage on Flight 281 at ORD on 2–14–75." Delta agents were "very nice" to her; and explained to her that she "was signing something saying that [she] wouldn't sue and it would give [her] back compensation of one-way fare for not being able to go." Sherri Roman understood that the printed material on the back of the draft meant she was promising not to sue Delta because Flight 281 had been oversold and she was denied a confirmed reserved seat. However, when she signed the release, she was upset and not "quite sure what [she] was doing." Nonetheless, she endorsed the draft, and received from defendant's agents $78.70 in cash along with the refund of her ticket which she subsequently turned over to her father.

### II.

In Count I of the complaint, Sherri Roman alleges that Delta's failure to accommodate her on its Flight 281 was discrimination under section 404(b) of the Federal Aviation Act of 1958, 49 U.S.C. § 1374(b), which provides that "[n]o air carrier or foreign air carrier shall make, give, or cause any undue or unreasonable preference or advantage to any particular person, port, locality, or description of traffic in air transportation in any respect whatsoever or

subject any particular person, port, locality, or description of traffic in air transportation to any unjust discrimination or any undue or unreasonable prejudice or disadvantage in any respect whatsoever." She alleges that defendant violated its own priority rules in seating standbys and "bumping" her despite the fact that she had a ticketed reservation purchased well in advance of the flight. This discrimination caused her to suffer severe anxiety and distress and caused the loss of her luggage for twenty-four hours. She further alleges that she signed the release under conditions of economic duress and in a state of emotional distress, without having understood its meaning.

In Count II, Ann and Gabe Roman allege that Delta's failure to accommodate Sherri Roman was a breach of contract as to them because they paid for their daughter's ticket; or as third party beneficiaries, they sue to recover for Delta's breach of contract with their daughter. They further allege that as a result of Delta's acts, they suffered mental anguish and out-of-pocket losses arising from long-distance telephone calls, lodging and car rental expenses.

In Count III, the three plaintiffs join in alleging that Delta misrepresented to them that by purchasing a ticket, Sherri Roman would be accommodated on Flight 281; that Delta knew this representation was false because it knew the flight was oversold; and that plaintiffs relied on the misrepresentation, and hence, suffered mental anguish and out-of-pocket losses in arranging the family reunion in Fort Lauderdale, Florida on February 15, 1975.

In its motion supported by depositions, exhibits and documents, Delta contends that it is entitled to summary judgment against Sherri Roman because her acceptance of denied boarding compensation operated as a release under Civil Aeronautics Board Regulations and under Illinois law. It further contends that it is entitled to summary judgment against Ann and Gabe Roman either because they had no contractual relation with regard to any accommodation on Flight 281, or they are bound by

the terms of their daughter's release, or accord and satisfaction; and hence, have no cause of action for breach of contract. As to section 404(b) of the Federal Aviation Act of 1958, Delta insists that no relief can be granted the parents because even if there had been discrimination, they were not victims; nor have they standing to sue for what they allege were fraudulent misrepresentations.

Plaintiffs meet these contentions with the argument that there are material issues of fact between the parties concerning whether at the time Sherri Roman signed the release and accepted the compensation for denial of boarding she understood the words that were stamped on the back of the draft, and whether her distress during the transaction with Delta's agents invalidated the release. Therefore, the question to be decided is whether the pleadings, depositions, exhibits and documents disclose there is no genuine issue of material fact, and that movant is entitled to judgment as a matter of law. *Rose v. Bridgeport Brass Company*, 487 F.2d 804, 808 (7th Cir. 1973); Rule 56(c), Fed.R.Civ.P. In deciding this question, it must be determined whether on the undisputed facts of record, Delta's overbooking of its flights gave Sherri Roman a claim against it either under § 404(b) of the Federal Aviation Act of 1958, or under state law; whether, if there was such a claim, Sherri Roman can assert it after signing the release and accepting the denied boarding compensation; and whether under the circumstances of this case, Ann and Gabe Roman have any claim they can assert against Delta, one that survives the terms of the release signed by their daughter.

### III.

Overbooking is a practice by which all airlines accept more reservations for a flight than there are seats on an airplane. The practice is a response to the problem of "no-shows," persons who reserve seats on a flight but neither use nor cancel their reservations. Over the years, airlines have utilized varying methods of dealing with this

problem, including reconfirmation requirements, the imposition of reservation service charges, and ticketing time limits. *Comment, Federal Preemption of State Law: The Example of Overbooking in the Airline Industry,* 74 Mich.L.Rev. 1200, 1201 (1976). The current practice of deliberate overbooking has advantages and disadvantages. It enables airlines to reduce the chance that a fully-booked plane will depart with empty seats and hence increases their load factor. Moreover,

> "[t]he airline passenger has substantial freedom of choice to make reservations at carriers' offices or through agents and to cancel them by telephone or in person. Also, should a ticketed passenger have a change of plans, he is free in most situations to use his ticket on flights of other carriers without endorsement." Initial Decision, C.A.B. Docket 26253, Emergency Reservation Practices Investigation, at 8–9 (June 10, 1974).

However, "deliberate overbooking inevitably results in instances in which more persons holding confirmed reservations appear for a flight than are predicted so that some must be denied boarding." *Comment, supra,* 74 Mich.L.Rev. at 1201.

Because of the seriousness of the no-show problem, the Civil Aeronautics Board has approved overbooking practices. *See* Priority Rules, Denied Boarding Compensation Tariffs and Reports of Unaccommodated Passengers: Notice of Proposed Rule Making, C.A.B. Docket 16563, 32 Fed.Reg. 459, 460 (C.A.B. Order EDR–109) (Jan. 10, 1967). Civil Aeronautics Board Regulations, 14 C.F.R. §§ 250.1, *et seq.,* which have been in effect since 1967,[1] require carriers to file priority rules with the Civil Aeronautics Board and establish who shall be denied boarding on an oversold flight. Compensa-

tion, usually equal to the price of a one-way ticket to the first destination, must be provided if the carrier cannot transport the passenger within two hours of the scheduled arrival time of the flight on which boarding is denied. *Id.* at §§ 250.5, 250.6(b). The carrier must tender to each such passenger a written explanation of "the terms, conditions and limitations of the denied boarding compensation." *Id.* at § 250.9. Every carrier is obliged to file tariffs providing compensation for passengers who are denied boarding. *Id.* at § 250.4. These tariffs specify:

> [T]he carrier will tender, on the day and place the denied boarding occurs, compensation in the amount specified above, which, if accepted by the passenger, shall constitute liquidated damages incurred by the passenger as a result of the carrier's failure to provide the passenger with confirmed reserved space.

14 C.F.R. § 250.7

And the carrier is further required to

> tender to a passenger eligible for denied boarding compensation, on the day and place the denied boarding occurs, a draft for the appropriate amount of compensation provided in 250.5, and the reverse side of such draft shall include a release stating that when the draft is endorsed by the passenger, the passenger thereby relieves the carrier from liability for all claims for damages which might accrue to the passenger as a result of the carrier's failure to provide the passenger with space on the flight in question, provided that the draft is endorsed and paid within thirty days of the date on which the denied boarding occurs . . . . .

14 C.F.R. § 250.8

1. The Board has announced a proposed rulemaking proceeding with regard to deliberate overbooking and oversales. Priority Rules, Denied Boarding Compensation Tariffs and Reports of Unaccommodated Passengers: Reexamination of the Board's Policies Concerning Deliberate Overbooking and Oversales, C.A.B. Docket 29139, 41 Fed.Reg. 16478 (C.A.B. Order EDR–296) (April 13, 1976). The Board noted that "there now appears to be developing a

trend toward a higher rate of oversales" and that "oversales continue to be a significant cause of complaints received by the Board's Office of the Consumer Advocate." *Id.* (Footnote omitted.) For these reasons the Board has concluded that a reexamination of the overbooking and oversales problem "and all possible solutions or ameliorations" is necessary. *Id.* at 16479. To date, however, the regulations have not been changed.

Aside from denied boarding compensation, other remedies are available to the "bumped" passenger. It is well-settled that a private damage action is available to remedy violations of section 404(b) of the Federal Aviation Act of 1958, 49 U.S.C. § 1374(b). *See, e. g., Fitzgerald v. Pan American World Airways, Inc.,* 229 F.2d 499 (2d Cir. 1956); *Wills v. Trans World Airlines, Inc.,* 200 F.Supp. 360 (S.D.Cal.1961). The practice of overbooking does not *per se* give rise to an actionable section 404(b) violation. *Polansky v. Trans World Airlines, Inc.,* 523 F.2d 332, 335 n.10 (3d Cir. 1975); *Nader v. Allegheny Airlines, Inc.,* 167 U.S.App.D.C. 350, 360–361, 512 F.2d 527, 537–38 (1975), *rev'd on other grounds,* 426 U.S. 290, 96 S.Ct. 1978, 48 L.Ed.2d 643 (1976); *Archibald v. Pan American World Airways, Inc.,* 460 F.2d 14 (9th Cir. 1972). However, a violation by a carrier of its priority rules gives rise to a section 404(b) cause of action. *See, e. g., Mortimer v. Delta Air Lines,* 302 F.Supp. 276 (N.D.Ill. 1969). Sherri Roman has alleged such a violation.

In this case, it is undisputed that in connection with its provision of denied boarding compensation to Sherri Roman, Delta complied with all the pertinent Civil Aeronautics Board regulations.[2] Sherri Roman was given both a written and an oral explanation of the denied boarding compensation. A draft in the amount of $78.70 was tendered to her by defendant as denied boarding compensation. She signed the release, knowing what it meant, and endorsed and cashed the draft immediately. It does not appear that any court has decided a case dealing with the effect of economic duress or emotional distress on the validity of a release acquired by a carrier that acts in strict compliance with Civil Aeronautics Board regulations. One court has commented that, as a whole, the purpose of regulations is elimination of abuse of air flight overbooking; and that "requiring the carriers to give the oversold passenger a written explanation of his rights should act as a deterrent to mistreatment." *Nader v. Allegheny Airlines, Inc.,* 167 U.S.App.D.C. 350, 359, 512 F.2d 527, 536 (1975), *rev'd on other grounds,* 426 U.S. 290, 96 S.Ct. 1978, 48 L.Ed.2d 643 (1976). Federal law, of course, governs the relationship between an airline passenger and an air carrier. *Lichten v. Eastern Airlines, Inc.,* 189 F.2d 939, 940 (2d Cir. 1951); *Mack v. Eastern Air Lines, Inc.,* 87 F.Supp. 113, 115 (D.Mass. 1949). However, whether this case is approached from the view of either federal or state law, the same result is reached.

Denied boarding compensation is an alternative to a lawsuit. The Civil Aeronautics Board regulations provide that the compensation, if accepted, "shall constitute liquidated damages incurred by the passenger as a result of the carrier's failure to provide the passenger with confirmed reserved space." 14 C.F.R. § 250.7. So long as deliberate overbooking is permitted by the Board, consistent with the public interest; and. so long as the carrier complies with regulations requiring that the passenger denied boarding be tendered the compensation set by tariff, the passenger who accepts such compensation, rather than preserving his right to pursue common law remedies, should be held to the terms of the release. Any other conclusion would open the way to problems the system of denied boarding compensation was designed to prevent.

In this case, there is no dispute concerning Sherri Roman's state of mind at the time that she signed the release. She was upset by the inconvenience and hardship occasioned by defendant's failure to accommodate her as she had expected; but Delta's agents explained the effect of the release, and she understood the explanation. Under these circumstances, and in light of the airline's compliance with Board regulations, the court concludes that, as a matter of law, execution of the release relieved Delta of any and all claims Sherri Roman

---

2. The court notes that whether defendant in fact did or did not violate its own priority rules has not been established. However, this issue is not material, in light of Sherri Roman's acceptance of denied boarding compensation.

might have in connection with its failure to accommodate her on Flight 281.

■■■■ Moreover, viewed as a common law accord and satisfaction, the release was effective, despite Sherri Roman's allegations of emotional distress and economic duress. The rule in Illinois is that the validity of a release is governed by the law of the jurisdiction where it is given and delivered. *Woodbury v. United States Casualty Co.*, 284 Ill. 227, 120 N.E. 8 (1918); *Frazier v. Sims Motor Transport Lines, Inc.*, 196 F.2d 914, 917 (7th Cir. 1952). Therefore, it is Illinois law that determines whether the release in question was a valid one. In Illinois, to constitute an accord and satisfaction, "there must exist a bona fide dispute; the sum in dispute must be unliquidated; consideration must be present; however, payment by the debtor of a lesser sum as a compromise of a disputed claim may be deemed proper consideration; a meeting of the minds with intent to compromise is essential but may be gleaned from the words and acts of the parties; and, the accord must be executed." *Koretz v. All American Life & Casualty Co.*, 102 Ill. App.2d 197, 201, 243 N.E.2d 586, 588 (2d Dist. 1968) (citations omitted); *accord, Windlow v. Wager*, 29 Ill.App.3d 172, 179–80, 329 N.E.2d 911 (2d Dist. 1975). While this statement suggests a subjective standard of "meeting of the minds," Illinois case law shows that although fraud or mistake will prevent a meeting of the minds and invalidate an accord and satisfaction "the fact that the settlement was made on the wrong basis, or that the creditor received in settlement an amount considerably less than he could have recovered, or that he was ignorant of the legal rules governing such settlement is not a sufficient reason for disregarding the settlement made by him with full knowledge of the facts." Illinois Law and Practice, Accord & Satisfaction § 4, at 158–59 (1953); *Martin v. Alco-Deree Co.*, 216 F.Supp. 258, 261–62 (N.D.Ill.1963); *In re Cunningham's Estate*, 311 Ill. 311, 142 N.E. 740 (1924); *Janci v. Cerny*, 287 Ill. 359, 122 N.E. 507 (1919). The failure to know of, or to understand, the condition of payment will not operate to

prevent an acceptance of money tendered from operating as an accord and satisfaction, where that failure results from neglect or omission to read a condition as stated in the tendered explanation accompanying the proffered accord. Illinois Law & Practice, Accord & Satisfaction § 27, at 185–86 (1953); *Lafrentz & Karstens Co. v. Cavanagh*, 166 Ill.App. 306, 309–310 (1st Dist. 1911). And once a settlement is acted on, in the absence of an allegation of fraud in its procurement, the settling party will not be heard to say that he did not understand the agreement. Illinois Law & Practice, Accord & Satisfaction § 52, at 191 (1953); *Barnett v. Noble*, 155 Ill.App. 129, 132 (3d Dist. 1910). Therefore, under both Civil Aeronautics Board Regulations and Illinois law of accord and satisfaction, Sherri Roman's acceptance of Delta's denied boarding compensation operated as a valid release of all claims arising out of its failure to accommodate her on Flight 281. This being so, the release, as a matter of law, bars any claim her parents may have because as incidental beneficiaries, they cannot sue to enforce the contract that was extinguished by Sherri Roman's acceptance of denied boarding compensation. W. Corbin, Contracts §§ 813, 818 (1952); S. Williston, Contracts § 364A (1938); *Carson, Pirie, Scott & Co. v. Parrett*, 346 Ill. 252, 257–58, 178 N.E. 498 (1931); *L. B. Herbst Corp. v. Northern Illinois Corp.*, 99 Ill. App.2d 101, 241 N.E.2d 125 (2d Dist. 1968).

## IV.

■■■■ Ann and Gabe Roman assert a claim of fraudulent misrepresentation which they argue is independent of, and unaffected by, their daughter's release. State law governs this pendent claim. *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); *Erie R. Co. v. Tomkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). The traditional rule in Illinois has been that the law of the place of injury, the *lex loci delicti*, governs a cause of action in tort. More recent cases point to an analysis of the interests or "contacts" that a state has

with an occurrence as the means of determining choice of law in tort cases. *See Manos v. Trans-World Airlines, Inc.,* 295 F.Supp. 1166, 1169 (N.D.Ill.1968); *Ingersoll v. Klein,* 46 Ill.2d 42, 262 N.E.2d 593 (1970). Under either approach, the law of Illinois governs this tort claim.

■ Under Illinois law, the requirements of a cause of action for fraud based on misrepresentation are that a statement be made by the defendant with the intention that it reach the plaintiff and influence his action; that it does reach him, and that he does rely upon it to his detriment. *St. Joseph Hosp. v. Corbetta Construction Co.,* 21 Ill.App.3d 925, 954, 316 N.E.2d 51 (1st Dist. 1974). Privity is not a prerequisite of the cause of action. *Rozny v. Marnul,* 43 Ill.2d 54, 250 N.E.2d 656 (1969). In *Rozny,* a judgment was entered against defendant who had prepared a land survey for a real estate developer, who sold property to a builder from whom the plaintiffs purchased the improved property. The survey was passed on to a savings and loan association where plaintiffs saw and relied upon it in making the purchase. The survey was inaccurate and, as a result, the plaintiffs' house and garage had to be relocated. In holding the surveyor liable to the plaintiffs the court stated that:

> lack of direct contractual relationship between the parties is not a defense in a tort action in this jurisdiction. Thus, tort liability will henceforth be measured by the scope of the duty owed rather than the artificial concepts of privity. *Rozny v. Marnul, supra,* 43 Ill.2d at 62, 250 N.E.2d at 660.

The court emphasized six factors which it considered relevant to its determination of liability:

(1) The express, unrestricted and wholly voluntary "absolute guarantee of accuracy" appearing on the face of the inaccurate plat;

(2) Defendant's knowledge that this plat would be used and relied on by others than the person ordering it, including plaintiffs;

(3) The fact that potential liability in this case is restricted to a comparatively small group, and that, ordinarily, only one member of that group will suffer loss;

(4) The absence of proof that copies of the corrected plat were delivered to anyone;

(5) The undesirability of requiring an innocent reliant party to carry the burden of a surveyor's professional mistakes;

(6) That recovery here by a reliant user whose ultimate use was foreseeable will promote cautionary techniques among surveyors. *Id.* at 67–68, 250 N.E.2d at 663.

Clearly, the elimination of the privity requirement does not mean that every aggrieved third person may recover from the maker of the misrepresentation. To allow recovery without any limitation on third persons would create the possibility of an indeterminate liability totally disproportionate to the notion of fault involved. Prosser has stated that where the defendant makes a fraudulent misrepresentation, an unidentified member of a group may recover provided that the defendant has special reason to expect that any member of the class may be reached and influenced. Prosser, *Misrepresentation and Third Persons,* 19 Vand. L.Rev. 231, 246–51 (1966), cited with approval in *Rozny v. Marnul, supra,* 43 Ill.2d at 65, 250 N.E.2d 656. However, liability is not imposed where the plaintiff is unidentified and the defendant has no special reason to expect that he may act in reliance:

> The defendant may well be aware that his representation is capable of being passed on to others, and that at some subsequent date it may come into the hands of someone who will rely on it, act upon it, and suffer loss if it is false. But this amounts to nothing more than the general foreseeability of transmissions to others which is inseparable from the human word. In the face of indeterminate extent, magnitude, and duration of liability, the courts have always drawn back from its imposition. Prosser, *Misrepre-*

*sentation and Third Parties, supra,* at 251–52. (Footnote omitted.)

Ann and Gabe Roman assert that Delta fraudulently misrepresented to them that space would be available for their daughter when it accepted her confirmed ticketed reservation. They insist that they relied on that representation in making plans for the family reunion, to their detriment. This claim is essentially based on the understanding of defendant's advertising that "Delta is ready when you are." The Romans take this commercial to mean that a confirmed ticketed reservation will be honored absolutely. However, in view of the cited case, this court finds that Ann and Gabe Roman are in a position too remote to be eligible to recover from defendant for any misrepresentation made in connection with Flight 281. For while it is possible that reliance by the Romans on Delta's representation was foreseeable, in the same way that Delta could foresee the entire public becoming aware of its advertising, foreseeability is not the sole test in determining who may recover for a misrepresentation. As the Illinois Supreme Court stated in *Rozny v. Marnul, supra,* 43 Ill.2d at 66, 250 N.E.2d at 662, "the unknown and unlimited liability factor . . . is not to be lightly discounted." To hold that Ann and Gabe Roman were among the class of persons who could recover from Delta would extend potential liability to a class virtually as large as the public. Potential liability in a case of this sort would thus be expanded to include an unlimited class of persons, far removed from the transaction or incident, who rely on defendant's advertising representations in making social plans with any of the defendant's potential passengers. This court thinks that Illinois would not so extend liability and consequently holds that Ann and Gabe Roman cannot recover because Delta's duty did not extend to them.

For these reasons, defendant's motion for summary judgment is granted. An appropriate order will enter.

So ordered.