### COLORADO INTERSTATE GAS COMPANY

v.

### HUFO OILS, Lynn S. Hunt and Carl C. Foulds.

### No. MO–84–CA–58.

United States District Court,
W.D. Texas,
Midland-Odessa Division.

June 20, 1985.

## MEMORANDUM OPINION AND ORDER

BUNTON, District Judge.

Before the Court is Plaintiff COLORADO INTERSTATE GAS COMPANY's (CIG) motion, pursuant to Rule 56, Federal Rules of Civil Procedure, for summary judgment. After reviewing the pleadings filed herein and the relevant legal authorities, and hearing arguments of counsel, the Court is of the firm opinion that, considered in a light most favorable to Defendants HUFO OILS, LYNN S. HUNT AND CARL C. FOULDS, (collectively referred to as HUFO), there exists no genuine issue of material fact and that CIG is entitled to judgment as a matter of law. *Galindo v. Precision American Corporation,* 754 F.2d 1212 (5th Cir.1985).

### I.

On June 15, 1928, Amarillo Oil Company (Amarillo) assigned to Canadian River Gas Company (Canadian) all "gas, gas rights, and gas privileges" under ten oil and gas leases, dated from 1916 to 1928, on land owned by Lee Bivins. Amarillo retained the oil rights under the ten Bivins leases, which were eventually released and reverted to the descendants of Lee Bivins (the Bivins Interests).

On May 1, 1939, a Consolidated Lease Agreement was entered into between Canadian and the Bivins Interests which consolidated the gas rights previously conveyed to Canadian and, in addition, conveyed gas and gas rights to another 6,320.7 acres of land. Approximately ten years later, on August 18, 1949, Canadian and the Bivins Interests entered into an Operating Agreement. By its terms, this Operating Agreement set forth the parties' "respective rights and obligations in connection with future operations for the production of oil and gas to be conducted upon the premises covered by said consolidated lease agreement." [1]

Michael Beatty, James Fisher, Wm. Gerner, Jr., Colorado Springs, Colo., James Austin Fisher, Dallas, Tex., W.O. Shafer, Odessa, Tex., for plaintiff.

Ivan Hasley, Austin, Tex., Stubbeman, McRae, Sealy, Laughlin & Browder, Midland, Tex., for defendant.

1. The Operating Agreement states in paragraph 10:

For the purpose of this agreement, the term "casinghead gas" shall mean any gas and/or

In 1951 Canadian merged with CIG and all of Canadian's rights under the 1939 Consolidated Lease and the Operating Agreement were assigned to CIG. On October 22, 1954, CIG and the Bivins Interests executed an agreement styled "New Consolidated Lease" which was to apply to, *inter alia*, the acreage subject to the 1939 Consolidated Lease. This 1954 New Consolidated Lease superseded the 1939 Consolidated Lease.[2]

On June 28, 1983, the Bivins Interests granted an "Oil and Casinghead Gas Lease" to HUFO on the following lands: Sections 14, 15, 16, 17, 29, 30, 31, 32 and 35, Block M–20, G & M Survey, Potter County, Texas. These lands are within the geographical scope of the Operating Agreement.[3]

HUFO's Oil and Casinghead Gas Lease states in part:

> The oil and casinghead gas and oil and casinghead gas rights in certain of the lands described in this lease are subject

> oil vapor indigenous to an oil stratum and produced with commercial and paying quantities of oil from the same stratum, and shall be considered as part of the oil and oil rights.
>
> \*  \*  \*  \*  \*  \*
>
> Notwithstanding the above and foregoing definition of "casinghead gas," or any other provision in this agreement, it is understood that Oil Operator shall not produce, but shall plug and abandon or shut in, any well drilled or operated by Oil Operator which may produce both oil and casinghead gas in proportions which come within the classifications of a "gas well" as now defined by the statutes of the State of Texas.

The geographic scope of the Operating Agreement is defined by the following sentence found on page 3:

> The terms and provisions of this agreement shall cover and relate to all of the lands described in Exhibit "B" of said [1939 consolidated] lease agreement (as changed as hereinabove set out), and likewise all lands described in Exhibit "A" of said consolidated lease agreement, in which oil leasehold [sic] the rights heretofore granted by Oil Operator have been or may be hereafter, from time to time, terminated and re-vested in Oil Operator.

The duration of the Operating Agreement is defined by the following sentence found on page 3:

> The term of this agreement shall be coextensive with the term of said consolidated lease agreement; provided, however, that upon ter-

to the provisions of the instrument styled "Operating Agreement" dated August 18, 1949, recorded in Volume 1365, page 883, Deed Records of Potter County, Texas, entered in between Mary E. Bivins, et al, as "Oil Operator," and Canadian River Gas Company, as "Gas Operator."

> The rights and privileges granted to Lessee and the obligations imposed upon Lessee herein are and shall be subject to the provisions of said Operating Agreement insofar as it relates to any given tract of land which is described therein and in this lease, and Lessee agrees to be bound by and to assume the obligations imposed upon the Oil Operator in said Operating Agreement as to each such tract of land just as though Lessee had been named as the Oil Operator therein rather than Mary E. Bivins, et al, and Lessee shall succeed to benefits accorded to Mary E. Bivins, et al, in said Operat-

> mination of said Consolidated Lease Agreement as to a portion of the lands covered thereby, through surrender, release or other cause, such land or lands henceforth shall be excluded from the terms and provisions of this Agreement.

2. The New Consolidated Lease states that it

> "... is and shall be accepted as wholly valid and in good standing with no unfulfilled obligations or claims or demands whatsoever outstanding as of January 1, 1954."

No party which executed the 1954 New Consolidated Lease has ever asserted or suggested that the Operating Agreement was terminated in 1954 by the New Consolidated Lease. Indeed, the Bivins interests cited, enforced, recorded and endeavored to comply with the Operating Agreement after 1954.

3. The Operating Agreement provides as follows:

> Nothing herein contained shall, or shall be construed to, limit or restrict Oil Operator's right at any time, and from time to time, to lease to others all or any part of the premises covered by said Consolidated Lease Agreement for the production of oil, provided that any such lease shall be subject to, and shall obligate the lessee to faithfully perform all of the terms and provisions of this agreement insofar as they [sic] relate to and cover lands embraced within such lease.

ing Agreement insofar as they relate to each such tract of land.

On or about August 31, 1983, HUFO applied to the Texas Railroad Commission for permission to drill eight wells on Section 32, Block M–20, G & M Survey, Potter County, Texas. CIG owns and operates a gas well on this same section of land.

Subsequent to HUFO's application to the Texas Railroad Commission, Cabot Pipeline Corporation (Cabot) offered to purchase HUFO's future casinghead gas production on the Oil and Casinghead Gas Lease acreage. The terms of the offer were embodied in a document styled "Draft—Gas Purchase Contract."

Under the terms of the Operating Agreement, however, CIG had a right of first refusal on casinghead gas production from HUFO. Specifically, CIG's rights are outlined in the Operating Agreement as follows:

> In the event Oil Operator shall at any time, and from time to time, receive, and desire to accept, a bona fide offer to purchase all or any part of its casinghead gas production from lands covered hereby, for ultimate consumption outside of the Texas Panhandle gas field, Oil Operator shall notify Gas Operator, in writing, of all the terms and conditions of such offer, and for a period of thirty (30) days after receipt of such notice, Gas Operator shall have, and Oil Operator hereby grants to Gas Operator, the right, privilege and option to purchase such casinghead gas upon the terms and conditions of the offer as set forth in the notice. If Gas Operator shall refuse or fail to exercise such optional right within the period specified, then Oil Operator shall be privileged to accept the original offer in accordance with the terms and conditions specified in the notice to Gas Operator.

HUFO, rather than providing CIG with the first right of refusal, asked Cabot to revise its proposal. Cabot was asked by HUFO to change the following sentence in its proposal:

> The gas shall be delivered without prior processing for production extraction except that Seller may extract by use of lease separator a maximum of .42 gallons of heavy hydrocarbon liquids per MCF to maintain the gas-oil ratio of each lease.

HUFO changed the words "lease separator" to "lease separator or LTX [4] unit" and changed the maximum liquid production from ".42 gallons per MCF" to ".63 gallons per MCF." [5]

Cabot agreed to the changes proposed by HUFO. Accordingly, Cabot and HUFO executed a document styled "Casinghead Gas Purchase and Processing Agreement" dated November 18, 1983. Thereafter, on or about November 23, 1983, CIG received a letter from HUFO, together with an executed copy of the "Casinghead Gas Purchase and Processing Agreement" between HUFO and Cabot. This letter stated that CIG

> ... shall have in accordance with said paragraph 11 [of the Operating Agreement], thirty (30) days from receipt of this notice in which to exercise your option to purchase the casinghead gas production from Hufo Oils' lease on the same terms and conditions as set forth in the enclosed offer.

CIG responded to HUFO's offer by sending a letter dated December 22, 1983, stating:

> Please be advised that Colorado Interstate Gas Company hereby accepts your offer to sell "casinghead gas" (as "casinghead" gas is defined in Paragraph 10

---

**4.** The term "LTX" is an acronym for "low temperature extraction," describing gas processing units which cause hydrocarbons to condense or liquefy in a gas stream by refrigeration to temperatures below zero degrees Fahrenheit.

**5.** The ratio of 0.63 gallons per MCF is equal to 1.5 barrels per 100,000 cubic feet.

The term "MCF" is a unit of gas volume. Thus, the hydrocarbons which HUFO reserved the right to process in an LTX unit are in the gaseous phase when they are obtained at the surface of the well from which they are produced.

of the Operating Agreement) from the above-described acreage only, under the terms of the Cabot Agreement to the extent the terms of the Cabot Agreement are not violative of the provisions of the August 18, 1949, Operating Agreement or the laws, rules or regulations of any governmental agency having jurisdiction herein. For example, the use of gas processing units such as LTX units to maintain or adjust a well's gas/oil ratio is not permitted by the Operating Agreement.

HUFO responded to CIG's letter of December 22, 1983 by letter dated January 24, 1984, stating:

> The Operating Agreement does not prohibit the use of gas processing units. Your letter of December 22, 1983 is a rejection of the above-referenced agreement. Hufo Oils declines to accept your counteroffer as set forth in said letter.

CIG contends that HUFO's offer violates Paragraph 10 of the Operating Agreement in that it allows HUFO to operate wells which are "gas wells" under the Texas statutes of 1949. CIG further contends that HUFO's offer violated paragraph 11 of the Operating Agreement by allowing HUFO to sell that portion of the gas which is condensed to the liquid phase to third persons without first offering it to CIG as gas. CIG also contends that HUFO's offer violated paragraph 11 in that the offer was an executed, already effective contract with a third person. Finally, CIG contends that it accepted HUFO's offer to the extent that the offer did not violate the Operating Agreement.

HUFO contends that the Texas statutes of 1949 permitted the liquid product of an LTX unit to be counted as crude petroleum oil for well classification purposes, and so its offer did not contemplate operation of "gas wells" in violation of the Operating Agreement. HUFO further contends that CIG rejected its offer and that it complied with paragraph 11 of the Operating Agreement in all respects.

## II.

■ HUFO contends that, because there has been no oil or casinghead gas production on any acreage subject to HUFO's Oil and Casinghead Gas Lease, there lacks a justiciable controversy and this cause should be dismissed for lack of subject matter jurisdiction. CIG responds that HUFO's contention is "ludicrous."

CIG has asked this Court for a declaratory judgment on the dispute of whether a contract for the sale of gas was formed by CIG and HUFO in December, 1983 and whether certain terms of that contract are illegal. More specifically, CIG has sued for a declaration that HUFO's offer of first refusal was invalid under the Operating Agreement and, alternatively, that there is a contract between HUFO and CIG for the sale of casinghead gas.

The Court is of the opinion that subject matter jurisdiction exists and that CIG has presented for resolution a justiciable controversy. Simply because there has been no actual production does not create the lack of a justiciable issue; before the Court are issues of whether contract rights have been created between HUFO and CIG.

In *Halder v. Standard Oil Company*, 642 F.2d 107 (5th Cir.1981), a service station dealer/lessee asked the Court to declare what rights he would have against the lessor if the State of Georgia condemned the land subject to the lease. In *American F & C Company v. Pennsylvania T & F Mutual Cas. Ins. Company*, 280 F.2d 453 (5th Cir.1960), the insurer of the owner of a truck asked the Court to declare what liability it would incur if a person injured in a truck accident prevailed in an entirely separate lawsuit against the driver of the truck. Likewise, in *Coffman v. Breeze Corporation*, 323 U.S. 316, 65 S.Ct. 298, 89 L.Ed. 264 (1945), the holder of a patent sued his licensees to enjoin them from paying royalties to the government under the Royalty Adjustment Act, and attacking the constitutionality of the Act. The patent owner, however, asserted no claim to the royalties themselves and, in addition, the defendants did not contest the

constitutionality of the Act. In these cases, plaintiffs sought judicial determination of whether rights would exist under certain continencies outside the scope of the contract and beyond the control of the parties. Here, CIG alleges a present, vested right to purchase whatever gas HUFO produces.[6]

### III.

HUFO also contends that the Court lacks subject matter jurisdiction because this case falls within the primary jurisdiction of the Texas Railroad Commission. The Court disagrees.

The Court notes that this cause is in no way related to Railroad Commission rules and regulations. Rather, CIG is requesting of the Court a declaration of the rights and obligations of the parties to a contract. The fact that a provision in the contract contains a term which is defined by Texas statutes as they existed in 1949 does not provide any basis for this Court to abstain from deciding the contractual questions. *Markham v. Allen*, 326 U.S. 490, 66 S.Ct. 296, 90 L.Ed. 256 (1946) (mere fact that federal court, in the exercise of its jurisdiction is required to interpret state law is an insufficient reason to withhold relief to Plaintiff).

Moreover, there is no reason for abstention where the statutory provisions to be interpreted are plain and unambiguous. *County of Allegheny v. Frank Mashuda Company*, 360 U.S. 185, 79 S.Ct. 1060, 3 L.Ed.2d 1163 (1959); *Davis v. Mann*, 377 U.S. 678, 84 S.Ct. 1441, 12 L.Ed.2d 609 (1964); *Roloff Evangelistic Enterprises, Inc. v. State of Texas*, 556 S.W.2d 856 (Tex.Civ.App.—Austin 1977, writ ref'd n.r. e.). The applicable statutes presented here are plain and unambiguous and are easily capable of interpretation. Indeed, the same statutes have previously been inter-

preted by this Court in *Clymore Production Company v. Thompson*, 13 F.Supp. 469 (W.D.Tex.1936).

In *Railroad Commission of Texas v. Pullman Company*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), the Supreme Court indicated that abstention was proper if: (1) there exists an unsettled issue of state law; and (2) there exists a possibility that the state law determination will moot any federal constitutional question raised in the federal proceeding. Here, the Court is of the opinion that CIG's claims involve only matters of private contract rights; action of the Railroad Commission cannot serve to moot any of these issues. Moreover, the Court is not convinced that the issues involved in this case involve unsettled issues of state law. There exists simply a matter of interpretation of state law defining "oil well" and "gas well." This, the Court has previously done in *Clymore, supra*. Likewise, there is no federal "constitutional" question presented here which is in substantial danger of being mooted by Railroad Commission action.

Abstention is also proper where a case presents an issue of state law such that the state has an overriding interest in having the first opportunity to consider it and the state provides a unified method of formulating policy and determining cases. *Burford v. Sun Oil Company*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943). In *Burford*, Justice Black stated:

> Few public interests have a higher claim upon the discretion of a federal chancellor than the avoidance of needless friction with state policies, ... These cases reflect a doctrine of abstention appropriate to our federal system whereby the federal courts, 'exercising a wise discretion,' restrain their authority because of 'scrupulous regard for the rightful independence of the state governments' and

---

**6.** The Court notes that after CIG filed this action, HUFO filed a declaratory judgment action in state court against CIG in Dumas, Texas, raising many of the same issues present here. In its petition, HUFO alleged that "[t]his exchange of correspondence evidences a genuine dispute and actual controversy among the par-

ties as to their respective rights and as to the proper construction of the New Consolidated Lease and the 1949 Operating Agreement." Plaintiff's Original Petition, filed May 7, 1984, Case No. 84–43, 69th Judicial District, Moore County, Texas, at page 4.

for the smooth working of the federal judiciary ...

Id. at 332, 63 S.Ct. at 1106, citing *Pullman, supra.*

While certainly desirous of not invading the state province in determining matters of state law, the Court notes that no action of the Railroad Commission will be dispositive of the contractual rights in dispute among the parties. As CIG notes, not only are the contract issues not before the Railroad Commission, but the Commission is without jurisdiction to determine any such contractual disputes. Because the State of Texas has no overriding interest in the determination of what this Court considers to be a private dispute between HUFO and CIG, the Court finds the principals outlined in *Burford* to be inapplicable.

The Supreme Court has held that abstention is also proper if there is a state court proceeding pending in which the controversy between the parties can be resolved and "exceptional circumstances" exist. *Colorado River Water Conservation District v. United States*, 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976) ("[a]bstention from the exercise of federal jurisdiction is the exception, not the rule"). As has previously been stated, any Railroad Commission action will not be dispositive of CIG's dispute over its contract rights under the Operating Agreement. Abstention by this Court would not have the effect of avoiding "piecemeal" litigation.

In light of the relevant legal authorities and policy considerations, the Court does not feel that this is a proper case for abstention. Likewise, the Court cannot conclude that this is such a case that requires referral to an administrative body such as Railroad Commission on the grounds of primary jurisdiction.

"The doctrine of primary jurisdiction 'is concerned with promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties.'" *Nader v. Allegheny Airlines*, 426 U.S. 290, 303, 96 S.Ct. 1978, 1986, 48 L.Ed.2d 643 (1976) citing *United States v. Western Pacific R. Company*,

352 U.S. 59, 63, 77 S.Ct. 161, 164, 1 L.Ed.2d 126 (1956).

Because the dispute among these parties involve only legal issues, referral to the Railroad Commission would be, in the opinion of this Court, inappropriate.

If, as CIG contends, the 1949 statutes forbid counting natural gas as crude petroleum oil, then there is nothing the Commission can do to change that rule of law. There exists no need for the Railroad Commission's technical expertise in determining the claims of the parties.

In summarizing this already overly lengthy discussion on primary jurisdiction, suffice it to say that this Court concludes that reference to the Railroad Commission would serve only to further delay the resolution of this matter. Indeed, HUFO, by instituting its own legal action in Moore County state court at least impliedly believes that reference to the Railroad Commission is inappropriate. The Railroad Commission has not the authority nor the jurisdiction to resolve what the Court considers to be a private-contractual matter between CIG and HUFO.

## IV.

▮ The parties to the 1949 Operating Agreement agreed that the Oil Operator would not operate any well which was a "gas well" as then defined by Texas law. The Court proceeds with an examination of what is concededly scant authority on the matter.

The definitions of "oil well" and "gas well" were found in Article 6008 of the Civil Statutes (now § 86 of the Texas Natural Resources Code).

Section 2(j) of Article 6008 provides that the liquids manufactured from casinghead or any natural gas are classified as "natural gasoline"—not oil. The statutory definitions of "gas well" and "oil well" make no reference to "natural gasoline;" instead, what determines well classification is the amount of "crude petroleum oil" produced.

Section 2 of Article 6008 stated:

(d) The term "gas well" is any well (a) which produces natural gas not associated or blended with crude petroleum oil at the time of production, or (b) which produces more than one hundred thousand (100,000) cubic feet of natural gas to each barrel of crude petroleum oil from the same producing horizon, or (c) which produces natural gas from a formation or producing horizon producive of gas only encountered in a well bore through which crude petroleum oil also is produced through the inside of another string of casing.

(e) The term "oil well" is any well which produces one (1) barrel or more of crude petroleum oil to each one hundred thousand (100,000) cubic feet of natural gas.

The inescapable conclusion from the applicable statutes is that the classification of wells cannot be changed by post-production processing in an LTX unit.[7] Section 2(d)(a) provides "[t]he term 'gas well' is any well ... which produces natural gas not associated or blended with crude petroleum oil *at the time of production* ..." (emphasis supplied). The Court agrees with CIG that, under this provision, if gas could become "crude petroleum oil" by condensation in an LTX unit, then *all* gas would be "associated or blended with crude petroleum oil at the time or production" and there would exist no gas wells under § 2(d)(a).

Similarly, §§ 2(d)(b) and (d)(c) distinguished wells in which oil is produced from the same "horizon" as gas.[8] If hydrocarbons produced in the gaseous phase could be deemed "crude petroleum oil," then there likewise would exist no gas wells

under §§ 2(d)(b) and (d)(c). There would be no horizons productive of gas only and every well could be made to produce the requisite barrel of oil for each 100,000 cubic feet of gas.

The determination of whether a particular hydrocarbon is labeled "oil" or "gas" is determined at the time of production.

In *Clymore Production Company v. Thompson, supra,* oil operators had erected separators which extracted heavy hydrocarbon liquids from the gas produced by the purported "oil wells." The Texas Railroad Commission had ruled that the liquid caught in the separators was not "crude petroleum oil" within the meaning of the regulatory statutes. The *Clymore* Court agreed with the Railroad Commission's statutory interpretation:

It is our opinion from the evidence that complainant's wells do not produce any *crude petroleum oil in the statutory sense* of that term. They produce wet gas, which when acted upon by the baffleplates in the separator, causes a distillate which complainants claim is oil. It is only by the most strained and technical construction that wells of this character could be classified as oil wells. The statutes must be given a reasonable construction and construed with the view of effecting the legislative intent valid. We think it perfectly obvious that the statutory definition of an oil well was never intended to cover wells of this character which normally produces gas and can only be made to produce oil by the use of manufacturing processes, however, crude, at the head of the well ... [T]here enters into the *definition of crude oil* in

---

7. As CIG points out, if oil and gas were not mutually exclusive the ratio of oil to gas established in §§ 2(d)(b) and 2(e) would be a meaningless criterion for well classification. Operators could determine their own wells' classification simply by the operation of LTX units at the surface. Pure gas wells could be transformed into "oil" wells (0.63 gallons per MCF equals 1.5 barrels per 100,000 cubic feet—more than enough liquid to classify the well as an oil well and qualify for the benefits of that status).

8. The term "gas well" is any well (a) which produces natural gas not associated or blended with crude petroleum oil at the time or production, or (b) which produces more than one hundred thousand (100,000) cubic feet of natural gas to each barrel of crude petroleum oil from the same producing horizon, or (c) which produces natural gas from a formation or producing horizon productive of gas only encountered in a well bore through which crude petroleum oil also is produced through the inside of another string of casing. Art. 6008 § 2(d).

the applicable statutes the proposition that the substance referred to should lie in the bed or reservoir as oil and as oil be produced from it. It was certainly never intended to cover distillates such as those involved here *when the statute speaks of the production of crude petroleum oil.*

*Id.* at 470. (Emphasis supplied)

The Texas statutes interpreted by the *Clymore* court are the same statutes which define "gas well" for purposes of Paragraph 11 of the Operating Agreement. These statutes clearly state that natural gas liquids are not to be counted as crude petroleum oil in well classification.

## V.

■ Having determined that the parties to the Operating Agreement are bound by the 1949 statutory definition of "gas well," the Court concludes that liquids condensed from a stream of natural gas by an LTX unit may not be counted as "crude petroleum oil" in order to classify wells as "oil wells" instead of "gas wells."

The Court also finds that HUFO's offer to sell casinghead gas to CIG violated Paragraph 10 of the August 18, 1949 Operating Agreement in that it authorized HUFO to operate "gas wells" as defined by the statutes of the State of Texas as they existed in 1949. Further, HUFO's offer to sell casinghead gas to CIG violated Paragraph 11 of the Operating Agreement in that it allowed HUFO to sell a portion of its casinghead gas production to parties other than CIG by condensing that gas to the liquid phase and selling it as such.

Summary Judgment is hereby entered in favor of Plaintiff COLORADO INTERSTATE GAS COMPANY in accordance with this Memorandum Opinion and Order.

Costs are hereby assessed against Defendants HUFO OILS, LYNN S. HUNT and CARL C. FOULDS, jointly and severally, for which execution may issue if not timely paid.

IT IS SO ORDERED.