**G. & T. TERMINAL PACKAGING CO., INC., and Anthony Spinale**

v.

**CONSOLIDATED RAIL CORPORATION.**

**Civ. A. No. 84–1173.**

United States District Court, D. New Jersey.

Oct. 24, 1986.

David J. Goldberg, Warren, Goldberg, Berman & Lubitz, Princeton, N.J., for plaintiff.

Laurence Z. Shiekman, Pepper, Hamilton & Scheetz, Philadelphia, Pa., for defendant.

LECHNER, District Judge.

Plaintiffs are engaged in the business of shipping agricultural goods by railroad. They commenced this action in 1984 seeking recovery of allegedly discriminatory rates paid by plaintiffs to defendant railroad company, and an injunction against future discriminatory rates. Judge Ackerman has previously dismissed all counts of the complaint except those alleging a common law cause of action against defendant.[1] Presently two motions are before the Court: (1) defendant's motion to dismiss the remaining common law claim and (2) plaintiffs' motion to restore two counts of the complaint asserting that defendant's allegedly discriminatory rates were designed to unlawfully inhibit plaintiffs from pursuing legal remedies for shipped goods lost or damaged by defendant railroad company.

*Facts*

G. & T. Terminal Packaging Co, Inc. ("G & T") is a New York corporation engaged in the business of shipping potatoes from the west coast to the New York City area. Anthony Spinale ("Spinale") is President and sole stockholder of G & T. Consolidated Rail Corporation ("Conrail") is a Penn-sylvania corporation engaged in the railroad business.

It appears that since at least 1983, Conrail has delivered G & T's potatoes from the west coast to G & T's terminals located in Kingsbridge and Hunts Point, New York. G & T alleges that in June, 1983, Conrail imposed an additional freight charge for transportation of G & T's potatoes which caused the rate charged G & T to exceed the rate charged other comparable shippers by some $500 to $600 per carload of potatoes. G & T has objected to the additional charges but Conrail has refused to reduce them.

By letter, dated September 30, 1983, counsel for G & T wrote to the chairman of the Interstate Commerce Commission ("ICC") to inquire whether the ICC had jurisdiction to entertain a legal action brought by G & T against Conrail challenging the allegedly discriminatory rates. By letter, dated October 11, 1983, the Director of the ICC's Office of Proceedings responded to the inquiry and indicated that because the ICC had exempted railroad carriers of fresh fruits and vegetables from virtually all previous forms of economic regulation (see discussion, *infra*) the ICC would not have jurisdiction to entertain G & T's suit. The letter indicated G & T would have to seek relief in the courts.

By complaint filed with this Court on March 26, 1984, G & T commenced this action asserting that Conrail's allegedly discriminatory rates violated provisions of the Interstate Commerce Act, 49 U.S.C. § 10101 *et seq.* (the "Act"), the common law, the antitrust laws and the United States Constitution. In opinions issued at hearings held on September 28, 1984 and April 8, 1985, Judge Ackerman dismissed G & T's claims under the Act and the Constitution and expressly ruled that G & T could assert its common law claims against Conrail in this Court. By stipulation of the parties filed January 2, 1985, G & T's antitrust claims were dismissed. Thus, the only cause of action remaining in this ac-

---

1. By order filed July 16, 1986, the case was assigned to me from Judge Ackerman.

tion is based on a common law claim of rate discrimination.

It appears that on September 27, 1985, Conrail filed a petition with the ICC seeking a declaratory judgment that G & T's common law remedies in this action were pre-empted by provisions of the Act. On March 5, 1986, the ICC issued a decision concluding, contrary to its October 11, 1983 letter, that it retained jurisdiction over all allegations of rate discrimination (the "March 5, 1986 Decision"). In addition, the ICC ruled that under its interpretation of the Act, G & T had no independent common law cause of action against Conrail.

Citing the ICC decision and a recent Supreme Court case, Conrail brings the present motion for summary judgment dismissing G & T's remaining common law claim. G & T has opposed Conrail's motion and has moved the Court to restore two counts of the complaint which Judge Ackerman previously dismissed. These two counts arise under provisions of the Act forbidding common carriers from taking steps to evade liability for damage suffered by goods shipped. G & T has submitted documents and evidence uncovered during the course of discovery in support of its claim that Conrail raised G & T's rates to inhibit G & T from pursuing liability claims against Conrail for damaged goods.

*Regulatory Framework*

Originally enacted by Congress in 1887, the Interstate Commerce Act is the basic legislation governing Federal regulation of common carriers. One of the core regulatory functions of the Act is to provide a mechanism for establishing the rates common carriers are allowed to charge shippers using the carriers. The original act required the ICC to determine "just and reasonable charges," either in response to complaints of discriminatory or unreasonable rates filed by shippers against carriers, or in response to carrier requests for rate increases. *See* H.Rep. No. 1035, 96th Cong., 2d Sess. Appendix, reprinted in 1980 U.S. Code Cong. & Ad.News 3978, 4025, 4029–31.

The Act was amended by the Staggers Rail Act of 1980, Pub.L. No. 96–448, 94 Stat. 1898, in which Congress made plain its intention that the railroad industry be significantly deregulated. The policy subsection of the Staggers Act states:

In regulating the railroad industry, it is the policy of the United States Government—

(1) to allow, to the maximum extent possible, competition and the demand for services to establish reasonable rates for transportation by rail;

(2) to minimize the need for Federal regulatory control over the rail transportation system and to require fair and expeditious regulatory decisions when regulation is required;

\*      \*      \*      \*      \*      \*

(4) to ensure the development and continuation of a sound rail transportation system with effective competition among rail carriers and with other modes, to meet the needs of the public and the national defense;

(5) to foster sound economic conditions in transportation and to ensure effective competition and coordination between rail carriers and other modes;

(6) to maintain reasonable rates where there is an absence of effective competition and where rail rates provide revenues which exceed the amount necessary to maintain the rail system and to attract capital. . . .

49 U.S.C. § 10101a.

Several other provisions of the Staggers Rail Act are relevant to the instant motions. With respect to the survival of a common law claim, 49 U.S.C. § 10103 provides: "Except as otherwise provided in this subtitle, the remedies provided under this subtitle are in addition to remedies existing under another law or at common law." The Act establishes that the general jurisdiction of the ICC over railroad carrier transportation issues, however, is exclusive: "The jurisdiction of the [ICC] . . . over transportation by rail carriers, and the remedies provided in this title with respect to the rates, classifications, rules and prac-

tices of such carriers, is exclusive." 49 U.S.C. § 10501(d).

One provision of the Staggers Act, critical to the case at bar, directs the ICC to exempt a classification or service of rail transportation from regulation under the Act where the ICC has determined that regulation "(1) is not necessary to carry out the transportation policy of section 10101a of this title; and (2) either (A) the transaction or service is of limited scope, or (B) the application of a provision of this subtitle is not needed to protect shippers from the abuse of market power." 49 U.S.C. § 10505(a). The exemption provision further asserts the ICC may revoke, in whole or part, an exemption which is determined to cause effects contrary to the stated policy of the Act: "The Commission may revoke an exemption, to the extent it specifies, when it finds that application of a provision of this subtitle to the person, class, or transportation is necessary to carry out the transportation policy of section 10101a of this title." 49 U.S.C. § 10505(d). The Staggers Rail Act's exemption provision also states that an ICC exemption does not relieve a rail carrier from its obligations to provide contractual liability for damaged or lost goods it carries[2] or to protect the interests of its employees. 49 U.S.C. § 10505(e), (g).

Heeding this Congressional deregulatory mandate, the ICC, in a decision dated February 17, 1983, exempted rail transportation of agricultural commodities, including potatoes, from regulation under the Act. *See Rail General Exemption Authority— Miscellaneous Agricultural Commodities,* 367 I.C.C. 298 (1983) (hereinafter referred to as *"ICC Exemption Decision").* The *ICC Exemption Decision* asserts:

> ... continued regulation of those commodities no longer appeared necessary to serve the Nation's transportation policy objectives or to protect shippers from abuse of market power by the railroads. Analysis showed that the distribution of

these commodities was characterized by one or more of the following: (1) precipitously declining market shares, (2) the availability of unregulated motor carrier alternatives; or (3) the limited nature of the remaining rail transportation.

*Id.* at 298. The opinion explains the exemption will enhance the competitiveness of railroads in the overall transportation industry and that "the record in this case is adequate to demonstrate that sufficient actual or potential competition exists in the movement of each of the exempted commodities to insure against abuse by the railroads." *Id.* at 300. The decision further asserts "if the railroads are shown to be abusing their market power (a highly unlikely event), then the Commission can revoke the exemption and reimpose regulation." *Id.* at 303.

*Discussion*

From a procedural standpoint, the motions now before this Court seek reconsideration of issues already decided on prior motions for summary judgment. The Federal Rules of Civil Procedure appear to allow for such review at the discretion of the Court and "upon such terms as are just." Fed.R.Civ.P. 60(b). Where there has been an intervening change in arguably controlling law, reconsideration of the Court's earlier decisions is appropriate and serves interests of equity and judicial economy. *See Max M. v. Thompson,* 585 F.Supp. 317, 321 (N.D.Ill.1984).

The parties each claim the *ICC Exemption Decision* constitutes a shift in the underlying legal framework of this action, sufficient to warrant reconsideration of this Court's prior findings. In addition, Conrail proffers a Supreme Court case decided subsequent to this Court's prior rulings, as controlling precedent warranting reconsideration of this Court's decision on the common law claim. Because this Court's prior rulings were based, at least in part, on the ICC letter disclaiming ICC jurisdiction over this claim of rate discrimi-

---

**2.** 49 U.S.C. § 11707 of the Act imposes claims liability on carriers for loss or injury to proper-
ty shipped with the carrier.

nation, the ICC's subsequent unanimous declaratory judgment that the ICC *does* retain jurisdiction over G & T's claim appears to present sufficient justification warranting reconsideration of this Court's prior decisions.

In these motions the parties are asking the Court to make legal determinations as to the Court's jurisdiction over this matter and the propriety of certain claims in this action. When a court is asked to resolve questions of controlling or applicable law, such questions are properly before the Court on motion for summary judgment. *See Paton v. LaPrade*, 469 F.Supp. 773, 779 (D.N.J.1978). The motions are considered in turn.

### A. Conrail's Motion to Dismiss the Common Law Claim

Conrail's position in seeking dismissal of plaintiffs' common law claim against allegedly discriminatory rates is straightforward. Conrail contends that under the plain terms of the Act, and as interpreted for close to 100 years, the ICC has had and continues to have sole jurisdiction to entertain shippers' claims of unfair or discriminatory rates against carriers. Conrail argues that when the ICC issued its decision exempting carriers of certain agricultural products, the ICC had no intention of resurrecting common law claims, assertable in courts, against allegedly unfair or discriminatory rates. To buttress this point, Conrail points to the ICC's declaratory judgment issued March 5, 1986. Furthermore, argues Conrail, when Congress authorized the ICC to exempt from regulation certain forms of transportation, Congress did not intend to allow for the introduction of "indirect" regulation of the railroads by the courts through common law interpretation. Rather, says Conrail, both Congress and the ICC anticipated (1) that competition in the transportation industry would prevent unfair rates from occurring, and (2) that claims of unfair or discriminatory rates should be addressed by the ICC, as warranted, by partial or total revocation of exemptions.

G & T's position that it retains its common law right to protest discriminatory rates in court is equally straightforward. G & T points out that prior to the *ICC Exemption Decision*, individual shippers were provided with a forum, the ICC, at which their grievances against unfair rates could be heard. When Congress gave the ICC its exemption authority, G & T asserts, Congress did not intend to leave individual shippers without remedy against discriminatory rates. Congress, says G & T, was concerned with unfettering rail carriers from restrictive and unwarranted administrative regulation, not with protecting carriers from individualized common law claims asserted by way of court adjudication. G & T claims that because the burden for obtaining revocation of an ICC exemption is difficult to meet, acceptance of Conrail's position effectively forecloses individual shippers from any forum for asserting discriminatory rate claims against carriers. Such a result, G & T submits, was clearly unintended by Congress when it passed the Staggers Rail Act.

The issue before the Court, therefore, amounts to a determination of Congressional intent: Whether Congress intended that railroad shippers who believe they are being charged discriminatory rates by common carriers exempted from regulation are entitled to seek relief in courts, based on common law claims, or only before the ICC, by persuading the ICC that an outstanding exemption is being abused in a manner unanticipated or unintended by the ICC and Congress. The issue is not clearly resolved by reference to the language of the statute. 49 U.S.C. § 10103 provides that, "except as otherwise provided, the remedies set forth in the Act are in addition to other statutory and common law remedies." Yet 49 U.S.C. § 10501(d) specifies that the ICC retains exclusive jurisdiction over rail transportation generally and, more specifically, the remedies with respect to rates and practices set by railroad carriers. The parties do not dispute that before the ICC exempted carriers of agricultural products from reg-

ulation, the ICC entertained exclusive jurisdiction and authority over questions such as the one now before this Court. But the parties do dispute, and on the face of the statute it is simply unclear, how Congress intended rate discrimination charges to be aired once the ICC had exempted a classification of rail transportation from regulation.

Although the legislative history to the Staggers Rail Act does not decisively settle the issue before the Court, the history is clear that Congress' intent in this amendment to the Act was to allow a wide degree of economic freedom to those forms of transportation exempted by the ICC from regulation. As stated in the Conference Report: "[M]any of the government regulations affecting railroads have become unnecessary and inefficient. ... Modernization of economic regulation of railroads, with greater reliance on the marketplace, is essential to achieve maximum utilization of railroads...." H.Conf.Rep. No. 1430, 96th Cong. 2d Sess., *reprinted in* 1980 U.S. Code Cong. & Ad.News 4110, 4111. The history suggests that when considering the exemption provision of the Act, Congress specifically recognized the possibility of abuse on the part of exempt carriers. The history indicates, however, Congress felt the benefits of deregulation outweighed the potential abuses and that such abuses would be minimized by effective competition in the transportation industry, or else remedied by appropriate ICC action. As stated in the Conference Report:

The conferees anticipate that through the exemption process the Commission will eventually reduce its exercise of authority to instances where regulation is necessary to protect against abuses of market power where other federal remedies are inadequate for this purpose. Particularly, the conferees expect that as many as possible of the Commissions's restrictions on changes in prices and services by rail carriers will be removed and that the Commission will adopt a policy

of reviewing carrier actions after the fact to correct abuses of market power. *Id.* at 4137.

The Conference Report proceeds to emphasize the exclusive nature of the remedies provided by the Staggers Rail Act, and its preemption of potential federal or state common law remedies:

The remedies available against rail carriers with respect to rail rates, classifications, rules and practices are exclusively those provided by the Interstate Commerce Act, as amended, and any other federal statutes which are not inconsistent with the Interstate Commerce Act. No state law or federal or state common law remedies are available.

*Id.* at 4138. Clearly the Act provides the exclusive mechanism for addressing claims of discriminatory rates, at least prior to an ICC decision exempting a class of rail transportation from regulation. Even after an ICC exemption decision, however, a strong implication to be drawn from the legislative history is that Congress recognized the potential for just the sort of abuses alleged in this case, and expected the ICC to address such abuses by reviewing the propriety of the exemption in question in whole or in part after the emergence of such abuse.

The legislative history evidences that opponents of the Staggers Rail Act were concerned about the potential problem that railroads would abuse their monopoly position at the expense of small or "trapped" shippers. Certain Congressmen noted "the bill deregulates rates in many cases where competition is not available to protect shippers and consumers from excessive rate increases. ... We believe the House of Representatives should carefully review the momentous and dangerous decision made by the Committee to move deregulation ... into the area where railroads enjoy a virtual monopoly position. This is an invitation to the railroads to abuse their market power." *Id.* at 4094, 4099. While these concerns may have been well-founded, the previously cited language from the Conference report submitted in support of

the Staggers Rail Act indicates supporters of the legislation considered these potentials for abuse could be effectively dealt with by the ICC.

G & T urges, as an interpretation of the legislative history, that Congress fully intended to protect individual shippers from abuse by retaining traditional common law protections. G & T points to the statements of Senator Exon during floor debates of the Staggers Rail Act in which the Senator indicated the legislation contained adequate protection for smaller or captive shippers: "All of the protections in the Senate bill as passed on April 1 of this year are contained in the conference agreement. These include discrimination protection, the common carrier obligation, car limitation provision, and the contract rate advisory service for shippers of agricultural, forest, and paper products." Yet these protections were all specifically built into the Staggers Rail Act and were to be enforced by the ICC. There is simply no basis for claiming Congress intended these protections be maintained and enforced independently by the courts. *See, e.g.,* 49 U.S.C. § 10701 (rates must be reasonable); 49 U.S.C. § 11101 (common carriers must provide service on reasonable request); 49 U.S.C. § 10741 (common carrier may not discriminate as to rates or service among similar shippers). The legislative history establishes no more than that Congress expected the legislation to achieve the goals of deregulation with a minimal amount of abuse; such abuse was to be addressed by the ICC.

While no court has squarely addressed the issue now before this Court, decisions in sufficiently analogous situations bolster the conclusion that the Congressional intent behind the Staggers Rail Act was to have the ICC monitor both the deregulation of the railroad industry and the inevitable abuses springing from that deregulation. As a preliminary matter, the Supreme Court has stated that the courts should exercise restraint in reviewing aspects of national transportation policy, as established by or delegated to the ICC: "Congress has therefore delegated the enforcement of transportation policy to a permanent expert body and has charged it with the duty of being responsive to the dynamic character of transportation problems. ... It is not for us [the Court] to tinker with" one element of that national policy. *Board of Trade v. United States,* 314 U.S. 534, 546, 548, 62 S.Ct. 366, 372, 86 L.Ed. 432 (1942). The Supreme Court has, more recently, emphasized the importance of allowing the ICC to handle issues involving the regulation of carrier rates. In reversing a Court of Appeals decision interfering with the ICC's authority over carrier rates, the Supreme Court stated: "[The Court of Appeals' action] undermines the Commission's ability to exercise the primary jurisdiction delegated to it by Congress to insure equitable and uniform rates." *Burlington Northern Inc. v. United States,* 459 U.S. 131, 142, 103 S.Ct. 514, 521, 74 L.Ed.2d 311 (1982). Although these cases arose prior to the ICC's invocation of its exemption power, they demonstrate a longstanding recognition that maintenance and enhancement of national transportation policy has long been properly within the immediate jurisdiction of the ICC.

The Supreme Court's decision in *Transcontinental Gas Pipe Line Corp. v. State Oil and Gas Bd.,* —— U.S. ——, 106 S.Ct. 709, 88 L.Ed.2d 732 (1986) *("Transco"),* while not directly on point, provides some insight as to policies courts should consider in determining Congressional intent where Congress has authorized deregulation in a previously highly regulated field. The case required a judicial determination of Congressional intent behind enactment of the National Gas Policy Act of 1978, 15 U.S.C. § 3301 *et seq.,* a statute which in part revoked the power of the Federal Energy Regulatory Commission ("FERC") to regulate aspects of sales of natural gas. The case arose as a challenge to a Mississippi State Gas and Oil Board ("Board") order. The order required a purchaser of natural gas from a single source that had several producers to purchase gas without discrimination in favor of any one producer of the source's gas. The state courts had af-

firmed the Board order, holding that when Congress determined to preclude federal regulation over such sales of natural gas, it did not intend to preempt state regulation over such sales of natural gas.

The Supreme Court reversed the state courts, holding that when Congress decided to curb federal regulation, thereby giving "market forces a more significant role in determining the supply, the demand, and the price of natural gas," Congress did not intend "to give the states the power it had denied FERC." *Id.* at 717. Although the decision is arguably not controlling insofar as it involved review of a decision of a state's regulatory authority rather than review of a court invoking common law principles, several related underlying concerns raised by Justice Blackmun in the opinion appear to have general applicability to the case at hand.

One such concern was whether allowing state regulation (in the case at bar this concern would be with judicial intervention via common law) in an area Congress intended to relieve of federal regulation would conflict with the underlying Federal interest in deregulation. A second inquiry was whether Congress intended to give states (in the case at bar this concern would be with the courts) regulatory authority Congress had denied to Federal authorities. A related concern was whether permitting the state (in the case at bar, the courts) to regulate where Federal authorities could not, would disrupt the uniformity of the Federal regulatory scheme. *Id.* at 717–18. Deciding that each of these concerns warranted against allowing the states to step in where Congress had caused the federal authority to step out, the Court held: "In light of Congress' intent to move toward a less-regulated natural gas market, its decision to remove jurisdiction from FERC cannot be interpreted as an invitation to the States to impose additional regulations." *Id.* at 717.

Each of the concerns raised in *Transco* is applicable to the case at bar. Recognizing a judicial common law cause of action for discriminatory rates would in effect give license to *de facto* judicial regulation over common carrier rates. This is regulation that Congress, through the ICC, has decided is unnecessary at least until it appears the ensuing abuses cannot otherwise be curbed. Certainly permitting adjudication of discriminatory rate claims would interfere with the Congressional intention that abuses flowing from deregulation be uniformly corrected, as those abuses surface, by ICC corrective action. Although it is true by definition adjudication is a legal process distinct from administrative regulation, in terms of practical application the inevitable effects of adjudication may not be so distinct. As the Supreme Court pointed out in *Chicago & North Western Transportation Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311, 326, 101 S.Ct. 1124, 1134, 67 L.Ed.2d 258 (1981): "A system under which each State could, through its courts, impose on railroad carriers its own version of reasonable service requirements could hardly be more at odds with the uniformity contemplated by Congress in enacting the Interstate Commerce Act."

The problems arising when various state and Federal bodies and courts become involved in reviewing issues such as the one now before this Court, were aptly pointed out in *W.D. Lawson & Co. v. Penn Central Co.*, 456 F.2d 419 (6th Cir.1972). That case involved common law and statutory claims arising from the destruction of property shipped by the defendant railroad. In ruling that the plaintiff's common law claims had been pre-empted by Federal statutory remedies, the court quoted the Supreme Court's decision in *Adams Express Co. v. Croninger*, 226 U.S. 491, 33 S.Ct. 148, 57 L.Ed. 314 (1913):

'Some States allowed carriers to exempt themselves from all or a part of the commonlaw liability, by rule, regulation, or contract; others did not; the Federal courts sitting in the various States were following the local rule, a carrier being held liable in one court when under the same state of facts he would be exempt from liability in another; hence this branch of interstate commerce was being subjected to such a diversity of legisla-

tive and judicial holding that it was practically impossible for a shipper engaged in a business that extended beyond the confines of his own State, or for a carrier whose lines were extensive, to know without considerable investigation and trouble, and even then oftentimes with but little certainty, what would be the carrier's actual responsibility as to goods delivered to it for transportation from one State to another.' *Quoting, Southern Pacific Co. v. Crenshaw [Bros.],* 5 Ga.App. 675, 687, 63 S.E.Rep. 865.

*W.D. Lawson,* 456 F.2d at 422. Given the legislative history to the Staggers Rail Act previously cited, it cannot be said Congress intended to return to a state-by-state regulatory scheme by reintroducing common law remedies for allegedly discriminatory rates.

Although the March 5, 1986 Decision is not binding on this Court, its views on the scope of its jurisdiction under the Act are entitled to due respect. *See Blum v. Bacon,* 457 U.S. 132, 141, 102 S.Ct. 2355, 2361, 72 L.Ed.2d 728 (1982). The ICC's conclusions support the position that Congress intended, and the ICC understands Congress to have intended, that even after the ICC had invoked its exemption authority to deregulate a segment of the railroad industry, the ICC remained the principal authority responsible for interpreting and applying national transportation policy. As pointed out by the ICC: "If another body were allowed to replace the regulatory restrictions dismantled at the Commission, the agency's exemptive actions would be nugatory. Worse, the potential for variation and conflict among various decision-makers could make the post-exemption regime more restrictive of rail carriers than the one suspended by the exemption." March 5, 1986 Decision at 5. The ICC's point is well taken. If aggrieved shippers could resort to the courts for relief from discriminatory rates resulting from abuses under the deregulatory scheme, the ICC may never have an opportunity to review such abuses and address them. Such a result is clearly contrary to the evident Congressional intent behind the ICC's exemption-revocation authority.

G & T cites to *Nader v. Allegheny Airlines, Inc.,* 426 U.S. 290, 96 S.Ct. 1978, 48 L.Ed.2d 643 (1976), as support for its position that common law remedies remain available to aggrieved shippers despite the presence of an arguably controlling preclusive regulatory scheme. In *Nader,* the plaintiff had been "bumped" from an airline flight, despite his confirmed reservation. The plaintiff asserted common law tort claims and statutory claims against the airline. The Court of Appeals ruled, *inter alia,* the District Court should have withheld decision on the common law claim pending a determination by the Civil Aeronautics Board of plaintiff's statutory claim. In reversing the Court of Appeals and allowing the plaintiff's common law tort claims to proceed, the Supreme Court explained "we are not faced with an irreconcilable conflict between the statutory scheme and the persistence of common-law remedies. ... The court in the present case ... is not called upon to substitute its judgment for the agency's on the reasonableness of a rate—or, indeed, on the reasonableness of any carrier practice." *Id.* at 299–300, 96 S.Ct. at 1984–1985.

As has already been discussed, however, G & T's position in this action that this Court should entertain its common law claim of rate discrimination does irreconcilably conflict with the underlying deregulatory scheme enacted by Congress and implemented by the ICC. Contrary to the situation in *Nader,* this Court is being asked to interpret the reasonableness of a common carrier's practice. The legislative history suggests this inquiry is to be brought before the ICC in a challenge to the underlying exemption.

In sum, G & T claims it is the victim of discriminatory rates. If such rates are in fact being charged, competition in the transportation industry is not operating effectively as Congress and the ICC expected it would when the ICC issued the exemption for carriers of agricultural products. Consequently, Conrail is allegedly in a position where it can effectively abuse its monopoly power to the detriment of G & T

and other similarly situated shippers. This is precisely the type of abuse Congress intended the ICC to address "after the fact" of deregulation. H.Conf.Rep. No. 1430, 96th Cong. 2d Sess, *reprinted in* 1980 U.S. Code Cong. & Ad.News 4110, 4137. Conrail's motion to dismiss G & T's common law claim of rate discrimination is granted.

### B. G & T's Motion to Restore Claims Under the Act

Plaintiffs have moved the Court to restore those aspects of the original complaint asserting that Conrail's discriminatory rates constitute an effort to deny plaintiffs their statutory right to pursue liability claims for goods damaged while being shipped. 49 U.S.C. § 11707 provides shippers the right to pursue such damage claims, and 49 U.S.C. § 10505(e) provides that no ICC exemption decision can deny shippers such right. G & T claims that Conrail's increased rates seek to deny indirectly a right that may not be denied directly. Conrail counters that Judge Ackerman has already squarely examined and rejected this claim, and nothing new has been added to the record to warrant rejection of Judge Ackerman's decision.

At oral argument, heard by this Court on October 20, 1986, counsel indicated that G & T's damage claims are being independently pursued in New York proceedings. In his opinion rendered from the bench on September 24, 1984, Judge Ackerman recognized that those damage claims were underway in New York, and rejected the very claim plaintiffs now seek to resurrect: "I am not persuaded by [plaintiff's] arguments. Plaintiffs' damage claims are being independently ... litigated in separate legal proceedings. These claims will be adjudicated according to the law and amount of plaintiffs' recovery for their alleged losses will be ... unaffected by the rates charged by defendant in the interim." Ackerman, J., Opinion, filed September 28, 1984, at 11–12. With respect to plaintiffs' damage liability claims, there is nothing new in the record to indicate Judge Ackerman's decision should be overturned. Clearly G & T may continue to actively pursue its damage claims through appropriate channels.

Plaintiffs' attempt to restore this aspect of the original complaint essentially does nothing more than raise the same charge of discriminatory rates against Conrail alleged in its common law claim. As explained earlier in this opinion, Conrail's ability to drive up G & T's rates without fear of losing G & T's business to a competitor carrier is evidence of something amiss in the deregulatory scheme envisioned by Congress and the ICC. As has already been concluded, such irregularities were intended by Congress to be addressed and corrected by the ICC. To hold otherwise would permit every shipper with a grievance against allegedly discriminatory rates, to fashion a claim under the Act that the carrier's rates were designed to curtail the shipper's liability claims. Such a result was not intended by Congress. Because the record before me offers no tenable grounds for readdressing Judge Ackerman's decision on this issue, plaintiffs' motion seeking restoration of Counts III and IV of the complaint is denied.

Counsel for Conrail is to submit an appropriate order.